## CHIPPEWA INDIANS OF MINNESOTA *v.* UNITED STATES ET AL.

No. 228.   Argued February 2, 1937.—Decided May 17, 1937.

*Messrs. Webster Ballinger* and *D. S. Holmes* for appellants.

*Assistant Solicitor General Bell* argued the cause, and *Solicitor General Reed, Assistant Attorney General Blair,* and *Messrs. George T. Stormont, Walter C. Shoup,* and *Charles A. Horsky* filed a brief, on behalf of the United States, appellee.

*Mr. Fred Dennis* for the Red Lake Band of Chippewa Indians of Minnesota, intervener-appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was a suit by the Chippewa Indians of Minnesota against the United States to recover the value of 663,421 acres of land alleged to have been ceded to the defendant

under an express trust for the benefit of the plaintiffs and subsequently disposed of or appropriated by the defendant in disregard of the trust and of the rights of the plaintiffs. This 663,421 acres comprised what is hereinafter described as the *diminished* Red Lake Reservation.

The suit was brought and conducted under permissive legislation.[1] The defendant traversed the allegations of the plaintiffs' petition; and by leave of court, and in virtue of authority given in the permissive legislation, the Red Lake Band of Chippewas intervened for the purpose of opposing the plaintiffs' claim and of protecting its own interests. After a full hearing the court made special findings of fact and rendered a judgment for the defendant. 80 Ct. Cls. 410. The plaintiffs were allowed an appeal to this Court under a special supplement to the permissive legislation.

The Chippewa Indians of Minnesota, plaintiffs below and appellants here, comprise those who are designated in the act of January 14, 1889, *infra,* as "all the Chippewa Indians of Minnesota," otherwise described in the permissive legislation already mentioned,[2] as all who are "entitled to share in the final distribution of the permanent fund" provided for in § 7 of the act of 1889.

The findings below are too long to be repeated here and will be much summarized.

About the beginning of the last century the Chippewas constituted one of the larger Indian tribes in the northerly part of the United States. In early treaties they were dealt with as a single tribe and were shown to be occupying a large area reaching from Lake Huron on the east

[1] Act May 14, 1926, c. 300, 44 Stat. 555, as specially supplemented May 18, 1928, c. 623, 45 Stat. 601; June 18, 1934, c. 568, 48 Stat. 979; June 22, 1936, c. 714, 49 Stat. 1826.

[2] Act June 18, 1934, c. 568, 48 Stat. 979.

to and beyond Lake Superior on the west.[3] In later treaties they were regarded as divided into distinct bands; and particular bands—in some instances a single band and in others a limited plurality of bands—were recognized as occupying separate areas in Michigan, Wisconsin, Minnesota and eastern Dakota, and as entitled to hold or cede the same independently of other bands and of the Chippewas as a whole.[4] Some of the bands became permanently settled in Michigan and Wisconsin. Others—usually as a single band and exceptionally as a group of a few bands—became the recognized occupants and holders of twelve separate reservations in Minnesota. It is to these Minnesota bands and reservations that this suit relates.

One of the bands in Minnesota was the Red Lake which had come to include or be associated with the Pembina band. For a long period these two bands had been the exclusive occupants of the Red Lake Reservation, the largest of all. The next largest reservation was the White Earth. Its occupants were mostly members of the Mississippi bands; but some members of the latter were occupying older reservations which the White Earth had been designed to displace. This reservation contained an unusual proportion of land well suited for individual Indian allotments; and a small part of it had been allotted to individual Indians. The ten smaller

---

[3] Treaties Aug. 3, 1795, 7 Stat. 49; July 4, 1805, 7 Stat. 87; Nov. 17, 1807, 7 Stat. 105; Sept. 24, 1819, 7 Stat. 203; June 16, 1820, 7 Stat. 206; July 6, 1820, 7 Stat. 207; Aug. 29, 1821, 7 Stat. 218; April 19, 1825, 7 Stat. 272; Aug. 5, 1826, 7 Stat. 290; Aug. 11, 1827, 7 Stat. 303.

[4] Treaties May 9, 1836, 7 Stat. 503; Jan. 14, 1837; 7 Stat. 528; Dec. 20, 1837, 7 Stat. 547; Oct. 4, 1842, 7 Stat. 591; Aug. 2, 1847, 9 Stat. 904; Aug. 21, 1847, 9 Stat. 908; Sept. 30, 1854, 10 Stat. 1109; Feb. 22, 1855, 10 Stat. 1165; Oct. 2, 1863, 13 Stat. 667; April 12, 1864, 13 Stat. 689; May 7, 1864, 13 Stat. 693; April 7, 1866, 14 Stat. 765; Mar. 19, 1867, 16 Stat. 719.

reservations require no other special mention than that some of the Indians belonging to them had received individual allotments in them.

---

By an act of January 14, 1889, c. 24, 25 Stat. 642, Congress proposed to all bands of Chippewas in Minnesota a plan for their relief and civilization through allotments in severalty, cession and sale of lands not required for allotments, placing the proceeds of sales, less various expenses, in a permanent interest bearing fund as hereinafter stated, using the interest for the support and education of these Indians, and ultimately distributing per capita the principal of the fund.

The act created a commission to negotiate with the different bands for a complete cession to the United States of their title and right to all of each reservation, "except the White Earth and Red Lake reservations, and to all and so much of these two reservations as in the judgment of said commission is not required to make and fill the allotments required by this and existing acts, and shall not have been reserved by the commissioners for said purposes."

The cession was to be made for the purposes and upon the terms stated in the act and was to be sufficient as to each reservation, except the Red Lake, if made in writing by two-thirds of the male adults over eighteen years of age in the band occupying and belonging to such reservation, and as to the Red Lake was to be sufficient if made in like manner "by two-thirds of the male adults of all the Chippewa Indians in Minnesota." All cession agreements were to become effective if and when approved by the President.

For the purpose of ascertaining whether the proper number of Indians joined in the cession, and for the further purpose of making allotments and payments to

individual Indians, the act required the commissioners to make an accurate census of each band, classifying the members as male and female adults and male and female minors, and further classifying the minors into those who were and those who were not orphans.

As soon as the census was taken and the cession obtained and approved, all of the Chippewas in Minnesota, except those on the Red Lake Reservation, were to be removed to the White Earth Reservation; and as soon as practicable allotments in severalty were to be made on the Red Lake Reservation to the Indians belonging to that reservation, and on the White Earth Reservation to all of the other Chippewa Indians in Minnesota—all allotments to be in conformity with the act and with another designated statute.[5] These provisions for allotments were qualified by other provisions to the effect, first, that no existing allotment in any of the reservations should be disturbed, except with the allottee's individual consent; secondly, that existing allotments in the White Earth Reservation were ratified and should be adjusted in tenure, conditions and quantity to the allotments provided for in the act; and, thirdly, that any Indian on any of the reservations might in his discretion take his allotment under the act on the reservation where he was so residing, instead of being removed to and taking an allotment on the White Earth Reservation.

As soon as the cession was obtained and approved the lands ceded to the United States were to be surveyed; and as soon as practicable after the survey the lands so ceded were to be examined and classified as pine lands or agricultural lands, and such as were classified as pine

[5] For provisions for enlarged allotments on White Earth Reservation see Act of April 28, 1904, c. 1786, 33 Stat. 539, and *Fairbanks* v. *United States*, 223 U. S. 215. And for provision for enlarged allotments on Red Lake Reservation see Act of February 20, 1904, c. 161, 33 Stat. 46, 48, Article IV.

lands were to be appraised with particular regard to the quantity and quality of the pine, and were to be sold by the United States at public auction, for cash, at not less than the appraised value, in forty-acre or smaller parcels.

The agricultural lands "not allotted under this act nor reserved for the future use of said Indians" were to be disposed of by the United States to actual settlers under the homestead law at one dollar and twenty-five cents an acre, to be paid in five equal annual instalments.

As provided in § 7 of the act, all money accruing from the disposal of the ceded lands, after deducting enumerated expenses, was to be placed in the Treasury of the United States to the credit of "all the Chippewa Indians in the State of Minnesota" as a permanent interest bearing fund for the period of fifty years. The interest was to be used for the support and education of such Indians, and at the end of the fifty years the permanent fund was to be divided and paid to "all of said Chippewa Indians and their issue then living" in cash and equal shares, subject to a reserved power in Congress to make limited appropriations from the fund during the fifty year period for the purpose of promoting civilization and self-support among these Indians.

Under the act of 1889 the commission, besides making the required census, conducted separate negotiations with each of the bands with the following results:

1. The Red Lake and Pembina bands (sometimes spoken of collectively as the Red Lake band or Red Lake Indians), occupying and belonging to the Red Lake Reservation, ceded to the United States, for the purposes and upon the terms stated in the act, their title and right to all of that reservation, save a designated tract containing 661,118 acres which the commission "reserved" for the purpose of making and filling allotments to them. The

cession was made by a written instrument showing what lands were reserved, and bearing the assent of more than two-thirds of the male adults over eighteen years of age in those bands.

2. The bands occupying and belonging to the White Earth Reservation, by a like instrument bearing a like assent, ceded to the United States their title and right to all of that reservation, save a specified tract which the commission had reserved for allotments. The instrument making this cession contained a further cession by such bands of their title and right to "all and so much of the Red Lake Reservation as is not required and reserved under the provisions of said act to make and fill the allotments to the Red Lake Indians in quantity and manner as therein provided."

3. As to each of the other ten reservations the band occupying and belonging to it, by a like instrument bearing a like assent, ceded the whole of such reservation to the United States, and included in the instrument a further cession respecting the Red Lake Reservation such as was included in the cession by the Indians of the White Earth Reservation.

4. The cession of so much of the Red Lake Reservation as was not required and reserved for allotments had the written assent not only of two-thirds of the male adults over eighteen years of age in the bands of that reservation, but also of two-thirds of the male adults of such age of all the Chippewas in Minnesota.

After making the census and obtaining the cessions the commission transmitted, through the Commissioner of Indian Affairs, to the Secretary of the Interior a report accompanied by the census, the instruments of cession, and a transcription of the negotiations with the several bands as stenographically reported. In its report the commission stated that the tract reserved by it from the Red Lake Reservation for allotments to the Red Lake In-

dians, of which there were then 1,168, contained 661,118 acres, and that "this is larger than they will eventually require, but as there are swamps and other untillable lands therein, it cannot be reduced until after survey and allotments shall be made."

The Secretary of the Interior transmitted the commission's report and the accompanying papers to the President for consideration by him; and on March 4, 1890, the President approved each instrument of cession and on the same day transmitted to the Congress for its information a statement of his approval, together with a copy of the commission's report and of all accompanying papers except the census rolls.[6]

By an act of August 19, 1890, c. 807, 26 Stat. 336, 357, Congress recognized the cessions, as so approved, by making appropriations to carry out such provisions of the act of 1889 as were to be given effect if and when the cessions were obtained and approved.

In instructions issued to the commission by the Commissioner of Indian Affairs, with the approval of the Secretary of the Interior, before the work of the commission was begun, it was said:

"It has not heretofore been claimed by anyone, and so far as the knowledge of this office extends, and certainly not by the Indians themselves, that the Red Lake Reservation is the common property of all the Chippewa Indians in Minnesota. None but the Red Lake and Pembina bands have ever claimed an interest in said reservation, and said bands have always been recognized and regarded as the sole owners by right of original Indian occupancy, the lands having never been ceded to the United States." And the commission was further

---

[6] House Ex. Doc. No. 247, 51st Cong., 1st Sess.

instructed that it was "necessary to exercise great care to reserve a sufficient area of land to make the required allotments"; and also that "the boundaries of the tracts so reserved . . . must be definitely determined and fixed and accurately described so that the Indians . . . [will know] just what and how much land they are parting with."

The minutes of the negotiations by the commission with the Indians of the Red Lake Reservation show that the commission assured these Indians that the land which it would reserve out of that reservation would belong to them and their children; that enough land would be reserved for them and their descendants for all purposes; that no other Indians would have any right therein; and that no allotments would be made immediately out of the land reserved. The minutes further show that a line was drawn on paper which the Indians said marked the reservation which they wished to have; that after further consultations between the commissioners and the Indians the line marking the part to be reserved was agreed upon; and one of the commissioners then said there was some doubt whether the Government would approve of their yielding so much, but "we will do the best we can." From the evidence as a whole the court below found that "the statements of the commissioners at the council meeting prior to the execution of the agreement (instrument of cession) were such that the Red Lake Indians would and did understand therefrom that they were not ceding any portion of their lands which in the agreement was specified as reserved."

November 8, 1892, the chairman of the commission, in a letter to the Commissioner of Indian Affairs, stated in substance that the commission had used an unofficial map to guide it and the Indians in bounding and describing

the land which was being reserved from the Red Lake Reservation; that this map was faulty and misleading in respect of the lower Red Lake around which part of the tract intended to be reserved was located; and that to "preserve faith with the Indians" he recommended that certain described lands omitted from the reservation made by the commission "be reserved from sale and added to said reservation." In further support of his recommendation he said "It was with great reluctance that they (the Indians) gave up any part of the upper lake, and if any part of the lower lake shall be taken from them they will think they were deceived or advantage taken of their ignorance." This letter was laid before the President with approving letters from the Commissioner of Indian Affairs and the Secretary of the Interior, and on November 21, 1892, the President made an Executive Order reserving the described lands from sale and adding them to the reservation made by the commission. The added lands comprised 2,303 acres theretofore included, apparently unintentionally, in the cession by the Red Lake Indians.

Continuously since the making of the Executive Order the lands thereby added to the reservation made by the commission have been treated by the United States as a part of that reservation, and the reservation as thus changed or corrected has been known as the diminished Red Lake Reservation.

No allotments in severalty have as yet been made on this diminished reservation, because the Red Lake Indians have thus far opposed the present making of such allotments and the administrative officers have not as yet considered it practicable to make them.

---

By an act of February 20, 1904, c. 161, 33 Stat. 46, 48, Congress modified and adopted an agreement negotiated

by an United States Indian inspector with the Red Lake Indians whereby the latter ceded to the United States a tract containing 256,152 acres out of the diminished Red Lake Reservation. This cession was in trust that the lands be sold by the United States and the proceeds be placed in the Treasury of the United States in a trust fund to the credit of the Red Lake Indians and be paid to them in stated installments. Articles 4 and 5 of the agreement declared:

"It is further agreed that the said Indians belonging on the said Red Lake Indian Reservation, Minnesota, shall possess their diminished reservation independent of all other bands of the Chippewa Tribe of Indians and shall be entitled to allotments thereon of one hundred and sixty acres each, of either agricultural or pine land, the different classes of land to be apportioned as equitably as possible among the allottees."

"It is understood that nothing in this agreement shall be construed to deprive the said Indians belonging on the Red Lake Indian Reservation, Minnesota, of any benefits to which they are entitled under existing treaties or agreements not inconsistent with the provisions of this agreement. It is the intention of this agreement that the United States shall act as trustee for said Indians to dispose of said land and to expend and pay over the proceeds as received from the sale thereof only as received, as herein provided."

---

The United States has been holding and now holds the diminished Red Lake Reservation and all monies derived therefrom, for the sole and exclusive benefit of the Red Lake Indians, and not for the benefit of the Chippewa Indians of Minnesota, who brought this suit.

The tract reserved by the commission out of the Red Lake Reservation at the time of the cession under the act

of 1889 contained 661,118 acres. The lands added to this reserved tract by the Executive Order of November 21, 1892, comprised 2,303 acres, making the so-called diminished Red Lake Reservation contain 663,421 acres. The tract ceded from this diminished reservation by the Red Lake Indians in the agreement embodied in the act of February 20, 1904, contained 256,152 acres.

The number of Red Lake Indians belonging to the Red Lake Reservation was, on March 4, 1890, 1,168; on February 20, 1904, 1,418; on February 26, 1927, the date of suit, 1,736; and, in 1932, 1,881.

In many acts passed since March 4, 1890, and cited in Findings 34, 35 and 36 of the court below (80 Ct. Cls. 410, 455–458), Congress has recognized the Red Lake Indians as entitled, exclusive of other Chippewas, to the diminished Red Lake Reservation and to all proceeds therefrom.

Other matters shown in the findings will be mentioned later on.

_____

The claims presented by the plaintiffs' petition and pressed in the court below were overlapping in part and substantially to the effect, first, that the lands reserved by the commission out of the Red Lake Reservation were only temporarily reserved for the purpose of making allotments to the Red Lake Indians at the time, in the quantity and of the character specified in the act of 1889; that subject only to such filling of these allotments the lands reserved were included in the cession and became part of the estate which the United States was to hold in trust for the benefit of all the Chippewa Indians in Minnesota; and that by subsequently failing to make any allotments from the reserved lands and permanently appropriating all of them, through the act of February 20, 1904, to the use and benefit of the Red Lake Indians, to the exclusion

of all other Chippewas, the United States wrongfully disposed of the lands in disregard of its trust obligations and of the rights of the plaintiffs, and thereby became liable to the plaintiffs for the value of the lands, or at least for the value of such of them as were not needed to fill the allotments which were to be made from them; secondly, that by adding to the reserved lands, through the Executive Order, 2,303 acres which had been included in the cession, the United States wrongfully withdrew the added lands from the trust estate and appropriated them to the use and benefit of the Red Lake Indians, to the exclusion of all other Chippewas, thereby becoming liable to the plaintiffs for their value; and, thirdly, that by the act of February 20, 1904, the United States wrongfully took 256,152 acres of the reserved lands from the trust estate and applied them to a new and different trust for the benefit of the Red Lake Indians, to the exclusion of all other Chippewas, and thereby became liable to the plaintiffs for the value of such of them as were not sold and for the proceeds from such as were sold.

From the findings made and from an examination of the instruments of cession and of the treaties, statutes and public documents referred to in the findings, the court below reached the conclusion that up to the time of the cession under the act of 1889 the Red Lake Indians had the full Indian title to the Red Lake Reservation, to the exclusion of all other Chippewas; that the lands reserved by the commission were not included in the cession, but explicitly reserved therefrom, and therefore the Indian title to them remained in the Red Lake Indians; that the lands which the Executive Order added to those which were so reserved were by mutual mistake included in the cession instead of being included in those reserved, and therefore the Executive Order should be regarded as having appropriately corrected that mistake

and made effective the true intention of the parties; and that in these circumstances the plaintiffs were not injured or entitled to recover by reason of any of the matters complained of, and their petition should be dismissed.

■ Complaint is made of the action of the court in regarding the Indian title to the lands in the Red Lake Reservation prior to and at the time of the cession as material. Plainly the complaint is without merit. Whether the title was in the Red Lake bands alone or in all of the Minnesota bands has a material bearing on the construction and effect of the cession, and also on the question of who, after the cession, had the title to the lands reserved.

■ Complaint is next made of the holding that the Indian title prior to and at the time of the cession was in the Red Lake bands. While there appears to have been some diversity of opinion on this question, we are of opinion that the court's solution of it is right. For a long period the Red Lake bands had been in the exclusive occupancy of the lands in the Red Lake Reservation. None of the other Minnesota Bands disputed this occupancy or the right to it. Some had in treaties relinquished all right to areas which included that reservation,[7] and others had recognized the occupancy and title of the Red Lake bands by both ceding and accepting adjacent lands expressly described as bounded on "the line of the Red Lake Reservation."[8] The officers of the United States charged with the administration of Indian affairs also had recognized, repeatedly and consistently,

[7] Treaties September 30, 1854, 10 Stat. 1109; February 22, 1855, 10 Stat. 1165; August 7, 1866, 14 Stat. 765.

[8] Treaty May 7, 1864, 13 Stat. 693; Executive Order March 18, 1879, concerning White Earth Reservation. Executive Orders Relating to Indian Reservations (1912), p. 87.

the occupancy and title of the Red Lake bands. Typical of such recognitions is a letter of January 8, 1889, by the Commissioner of Indian Affairs, which was written with the approval of the Secretary of the Interior for the information of the President. In the letter it was said: "None of the Indians in that State, except the Red Lake Indians, have any right, title or interest in the Red Lake Reservation."

The recognition of a Chippewa band as having title to a reservation occupied by it was not confined to the Red Lake bands or to the Red Lake Reservation. On the contrary, it had long been the settled rule in respect of the Chippewa Indians in Minnesota that a band or bands occupying a separate reservation should be regarded and dealt with as having the full Indian title to the lands therein. The Indians both recognized and gave effect to the rule. Many cessions were negotiated and carried out in conformity with it. The band or bands occupying a reservation ceded it in whole or in part without any participation by other bands and received and enjoyed the compensation without sharing it with others. Under the rule each of the bands existing in 1889 had theretofore made cessions and received pay therefor quite independently of the other bands. By a treaty of October 2, 1863, 13 Stat. 667, the United States negotiated a treaty with the Red Lake and Pembina bands whereby these bands ceded to the United States a described part of the lands then "owned and claimed by them," and the United States, in consideration of the cession, agreed to pay "to the said Red Lake and Pembina bands" a stated sum per annum for a limited period. In Article 6 of the treaty the lands not ceded were called "the reservation," and thereafter were regarded by the United States and the Indians as constituting the Red Lake Reservation.[9] The

---

[9] *Minnesota* v. *Hitchcock*, 185 U. S. 373, 389–390; *United States* v. *Holt State Bank*, 270 U. S. 49, 58.

treaty of 1863 was confirmed, with modifications not material here, by a treaty of April 12, 1864, with the same Indians, 13 Stat. 689. No other band participated in that cession or shared, or sought to share, in the compensation.

This array of matters making strongly for full Indian title in the Red Lake bands prior to and at the time of the cession of 1889 encounters direct contradiction in the report made to the House of Representatives by its committee on Indian affairs when presenting the bill which, after many amendments, became the act of 1889.[10]    In that report it was said:

"All of the Indians in Minnesota are members of the great Chippewa family, which has for generations occupied the northern and northeastern half of the State. There are now in all about 7,500 of these Indians, who occupy reservations and unceded lands amounting in the aggregate to about 4,700,000 acres of land.

.        .        .        .        .

"The so-called Red Lake Reservation is simply a remnant of unceded Indian territory occupied at present by the Red Lake band, but really the common property, so far as the Indian title is concerned, of all the Chippewa Indians in Minnesota.

.        .        .        .        .

"All the Chippewas in Minnesota really belong to one family, and this Red Lake Reservation is really a remnant of all that country once occupied by them in common, and thus a sort of common property."

In so far as the committee report states that the title to the lands in the Red Lake Reservation was held in common by all of the Chippewa Indians in Minnesota, rather than by the Red Lake bands, it is at variance with

---

[10] House Report No. 789, 50th Congress, 1st Sess.; Cong. Rec., 50th Congress, 1st Sess., Vol. 19, pt. 9, pp. 9130–9131.

what is otherwise indubitably shown, and evidently is based on a serious misapprehension of the real situation. It overlooks treaties wherein most of the other bands relinquished areas which included the lands in the Red Lake Reservation; takes no account of the rule, long applied by the Government and the Chippewa Indians, whereby a band or bands occupying a separate reservation were regarded as having the title to the lands therein and entitled to hold or cede them independently of other bands; puts aside the treaties of 1863 and 1864 which recognized the Red Lake and Pembina bands as owning the lands occupied by them, and also as entitled to make cessions therefrom without consulting other bands; fails to consider the absence of any claim by other bands to an interest in the lands of the Red Lake Reservation; and gives no effect to a formidable body of legislative and administrative action and opinion whereby the Red Lake bands, and they alone, were uniformly recognized as both occupying and having the Indian title to the lands in that reservation. It therefore is plain that the report cannot be taken as overcoming the facts otherwise indubitably shown.

■ Next it is insisted that even though the Indian title was in the Red Lake bands, Congress in § 1 of the act of 1889, declared that as to the Red Lake Reservation the cession should be sufficient if made by "two-thirds of the male adults of all the Chippewa Indians in Minnesota," and thereby enabled the Chippewas as a whole to cede that reservation, even over the objection of the Red Lake bands. To this we do not agree. Our decisions, while recognizing that the government has power to control and manage the property and affairs of its Indian wards in good faith for their welfare, show that this power is subject to constitutional limitations and does not enable the government to give the lands of one tribe or band

to another, or to deal with them as its own.[11]   And, of course, an act of Congress should not be given a construction which will imperil its validity where it is reasonably open to a construction free from such peril.[12]   The provision in § 1 of the act of 1889, on which the appellants rely, is, in our opinion, reasonably open to a construction certainly consistent with its validity.   The section directs the commission to negotiate with "all the different bands" for a cession of all of the reservations, except parts of two, and then provides that the cession shall be sufficient "as to each and all of said several reservations, except as to the Red Lake Reservation," if made by two-thirds of the male adults of the band occupying and belonging to such reservation, and "as to the Red Lake Reservation" shall be sufficient if made "by two-thirds of the male adults of all the Chippewa Indians in Minnesota."   A fairly admissible meaning of this is that negotiations were to be had with each and all of the bands, including those occupying the Red Lake Reservation; that the cession as to each reservation was to be by at least two-thirds of the male adults of the band occupying the same; and that as to the Red Lake Reservation the cession was to be not only by two-thirds of the male adults of the bands occupying that reservation but also by two-thirds of the male adults of all the Chippewa Indians in Minnesota.   To save the section from questionable validity, this meaning should be preferred to one involving a purpose to authorize a cession as to that reservation without the assent of the bands occupying it.   The additional requirement as to it that the cession have the assent of two-thirds of the male adults

---

[11] *Lane* v. *Santa Rosa*, 249 U. S. 110, 113; *United States* v. *Creek Nation*, 295 U. S. 103, 109–110; *Shoshone Tribe* v. *United States*, 299 U. S. 476, 497.

[12] *Panama R. Co.* v. *Johnson*, 264 U. S. 375, 390; *Anniston Mfg. Co.* v. *Davis*, (this day decided), *ante*, p. 337.

of all the Chippewa Indians of Minnesota may well be regarded as precautionary and intended, in view of the statements in the committee's report, to accomplish a cession which would be effective whether the title was in the Red Lake bands, as the administrative officers were holding, or was held in common by all the Minnesota Chippewas, as the committee stated. In this view of the section—which we think the right one—the act cannot be held to evince a purpose to take from one band without its assent and give to others. The commission evidently understood the provision as we do, for they went first to the Red Lake bands and there announced that the negotiations, if not resulting in the requisite assent of those bands, would be abandoned.

■ It is further insisted that the court erred in holding that none of the lands described in the instrument of cession as reserved by the commission for allotments was ceded, instead of holding that all were ceded, save those actually required to make and fill allotments at the time, in the quantity and of the character described in the act of 1889. We regard the holding as right. The act was not intended to secure a cession of all of the Red Lake Reservation, but only of so much of it as "in the *judgment of said commission*" was not required to make and fill the intended allotments, and was not "reserved *by the commissioners*" for that purpose. And the allotments were to be made, not within any definite period, but "as soon as practicable." The instrument of cession declared that the Red Lake bands ceded all of their reservation not included within designated boundaries and that the lands embraced within those boundaries had been reserved by the commissioners for the purpose of making and filling allotments. Thus it showed what lands were ceded and what were reserved. The act committed to the "judgment of the commission" the determination of how much and what would be required for allotments, and

laid on the commissioners the duty of reserving lands accordingly. The instrument of cession shows that the commission attended to these tasks. Whether the tasks were performed with appropriate wisdom is not open to inquiry in this suit. The instrument of cession, showing the lands ceded and the lands reserved, was examined by the Commissioner of Indian Affairs and the Secretary of the Interior and was then submitted to and approved by the President. With that approval it became effective. The lands which were reserved were not ceded, either by the terms of the instrument of cession or through the operation of the act. The Indian title to them remained after the cession, as before, in the Red Lake bands. The act contemplated their use in making allotments to members of those bands; but, as they were not ceded but reserved from the cession, the matter of whether and when they shall be allotted rests with the government and those bands and is not of any concern, in the sense of the law, to the other bands.

The cession of the Red Lake Reservation by the Indians of the other reservations differs in words from that by the Red Lake bands, but we regard them as in substance identical and as conforming to the act.

Error is also assigned on the court's ruling respecting the Executive Order of November 21, 1892, whereby 2,303 acres of the lands ceded under the act of 1889 were added to the lands reserved for allotments. The basis for this order, shortly stated, is that the lands so added were intended by the commission and the Indians to be included in the lands reserved and were by mutual mistake, incident to the use of an unofficial and faulty map, included among those ceded. Evidently the Red Lake bands were equitably entitled to have the mistake corrected. No intervening right stood in the way. The mistaken cession was to the United States, in trust for the ultimate benefit of Indian wards. In this situation we should hesitate a good deal before holding that the Presi-

dent's authority over Indian affairs is not broad enough to warrant a correction of the mistake by an Executive Order.[13] But, this aside, the appellants are without right to recover in respect of the lands which were the subject of the mistake. Save for it the lands would have been reserved, not included in the cession. Therefore, the appellants' interest in them through the cession and trust was colorable only, and in an appropriate proceeding, brought with the consent of the United States, the mistake could and doubtless would have been corrected. So, in no admissible view of the Executive Order can it be said to have worked any real injury to the appellants.

So much of the appellants' claim as is grounded on what was done by and under the act of February 20, 1904, is disposed of adversely to them by what already has been said respecting the title to the lands reserved from the cession of 1889.

It results that the judgment must stand.

*Judgment affirmed.*

---

[13] Rev. Stats. §§ 463, 465; *West* v. *Hitchcock,* 205 U. S. 80, 84–85; *Williams* v. *United States,* 138 U. S. 514, 524; *Knight* v. *U. S. Land Assn.,* 142 U. S. 161, 177, *et seq.; United States* v. *Mid West Oil Co.,* 236 U. S. 459, 469, *et seq.*