*26 ORIGINAL OPINION ANNOUNCED NOVEMBER 14, 19 38
Booth, Chief Justice,
delivered the opinion of the court:
The special jurisdictional act enabling the plaintiff Indians to sue in this court appears in Finding 1. The case grows out of alleged failure of the defendant to discharge its obligations under the act of January 14, 1889 (25 Stat. 642), and especially Sections 1 and 8 of that act. A judgment for a large sum of money is sought.
The act of January 14, 1889., has been several times before the Supreme Court. It is unnecessary to elaborate upon what the Supreme Court held to be its scope and purpose. It is sufficient for the purposes of this case to state that Congress in enacting the act clearly intended to put in effect the Government’s prevailing Indian policy, i. e., secure the dissolution of the various Indian Bands and Tribes involved, allot them lands in severalty, dispose of surplus lands for their benefit, and otherwise seek to civilize the Indians themselves. This act appears in Finding 4.
The plaintiff Indians assented to the provisions of the act of 1889, supra. The various bands ceded their lands in accord with the same. Allotments were made and accepted and the surplus lands, both timber and agricultural, were sold, accumulating a sum of money aggregating in excess of sixteen million dollars.
Inasmuch as the crucial issue in this case is more or less restricted to Sections 1 and 8 of the act of 1889, despite *27 repetition, we insert at this point the provisions of the same, to wit:
Sec. 7. That all money accruing from the disposal of said lands in conformity with the provisions of this act shall, after deducting all the expenses of making the census, of obtaining the cession and relinquishment,. of making the removal and allotments, and of completing the surveys and appraisals, in this act provided, be placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, which shall draw interest .at the rate of five per centum per annum, payable annually for the period of fifty years, after the allotments provided for in this act have been made, and which interest and permanent fund shall be expended for the benefit of said Indians in manner following: One-half of said interest shall, during the said period of fifty years, except in the cases hereinafter otherwise provided, be annually paid in cash in equal shares to the heads of families and guardians of orphan minors for their use; and one-fourth of said interest shall, during the same period and with the like exception, be annually paid in cash in equal shares per capita to all other classes of said Indians: and the remaining one-fourth of said interest shall, during the said period of fifty years, under the direction of the Secretary of the Interior, be devoted exclusively to the establishment and maintenance of a system -of free schools among said Indians, in their midst and for their benefit; and at the expiration of the said fifty years, the said permanent fund shall be divided .and paid to all of said Chippewa Indians and their issue then living in cash, in equal shares: Provided, That Congress may, in its discretion, from time to time, during tire said period of fifty years, appropriate, for the purpose of promoting civilization and self-support ¡among- the said Indians, a portion of said principal sum, not exceeding five per centum thereof. The United .States shall, for the benefit of said Indians, advance to them as such interest as aforesaid the sum of ninety thousand dollars annually, counting from the time when the removal and allotments provided for in this act shall have been made, until such time as said permanent fund, exclusive of the deductions hereinbefore provided for, shall equal or exceed the sum of three million dollars, less any actual interest that may in the meantime ¡accrue from accumulations of said permanent fund; the *28 payments of such, interest to be made yearly in advance, and, in the discretion of the Secretary of the Interior, may, as to three-fourths thereof, during the first five years be expended in procuring live-stock, teams, farming implements, and seed for such of the Indians to the extent of their shares as are fit and desire to engage in farming, but as to the rest, in cash; and whenever said permanent fund shall exceed the sum of three million dollars the United States shall be fully reimbursed out of such excess, for all the advances of interest made as herein contemplated and other expenses hereunder.
Sec. 8. That the sum of one hundred and fifty thousand dollars is hereby appropriated, or so much thereof as may be necessary, out of any money in the Treasury not otherwise appropriated, to pay for procuring the cession and relinquishment, making the census, surveys, appraisals, removal and allotments, and the first annual payment of interest herein contemplated and provided for, which money shall be expended under the direction of the Secretary of the Interior in conformity with the provisions of this act. A detailed statement of which expenses, except the interest aforesaid, shall be reported to Congress when the expenditures shall be completed [25 Stat. 645].
The plaintiff Indians contend that the provisions of these sections created a conventional trust and thereby precluded the defendant from disbursing any of the funds involved except in strict accord with the same, which is the equivalent of saying that in this instance the conceded authority of Congress over tribal Indian lands and funds does not obtain. The defendant not only failed to observe the terms of the trust but, on the contrary, has depleted the trust fund by various disbursements to the Indians. The amount thus disbursed is the amount of the judgment sought.
The record establishes the fact that the defendant has disbursed from the fund created by Sections 7 and 8 of the act of 1889. We say disbursed — perhaps we should say has reimbursed the Treasury from the fund to the extent of appropriations made by Congress and paid to the plaintiff Indians, Congress authorizing the reimbursement in most instances, for purposes not mentioned in the act of 1889 and contrary to the terms of the alleged trust agreement.
The act of 1889 is free from ambiguity. On the date of its enactment and subsequent approval it was the indisputable *29 intent of Congress to conserve the tribal funds accruing from, the sale of the surplus lands as provided therein. Doubtless, it was the belief of Congress that the income from the fund that was to be disbursed to the Indians annually during the fifty-year period would be sufficient, along with their individual landed estates, to maintain them, and at the same time would encourage the adoption of the ways of the Whites for themselves and future generations.
The total sum taken from the fund involved represents sums appropriated by Congress from public money which was paid directly to the Indians or for their benefit. The defendant in no way profited in doing what was done. It is not alleged and assuredly not established that the necessity for the appropriations made did not exist; hence, if the plaintiff Indians may recover all they claim, this court must hold that the fund was not a tribal one, and Congress in passing the act of 1889 surrendered its authority over Indian tribal funds and lands.
The twelve or thirteen bands of Chippewa Indians were tribal Indians. They held their reservations as tribal Indians. Kadrie case, 281 U. S. 206. True, some individual allotments had been made on certain reservations, but the greater acreage of their reservations was held and occupied as communal Indian lands. They were recognized by the defendant as tribal Indians, and the only possible distinction between the Chippewa Indians of Minnesota as a tribe and any other tribe of Indians was the division of the tribe into various bands. It was and is not now unusual to find a tribe of Indians made up of several bands who hold a reservation exclusive of other bands. This fact does not destroy the identity of the tribe as such or alter the character of the title by which their lands are held.
What was accomplished by the act of 1889 was a voluntary merger of all the tribal lands, participated in by all the bands of the Chippewa Tribe, and consummated by cessions of all the Chippewa bands. It was in effect, and resulted in, a resumption of a tribal unit, always known as the Chippewa Indians of Minnesota — an abandonment of band organization and a return to a single tribal one.
*30 The plaintiff Indians insist that the act of 1889 created “a new class or entity” without tribal organization, possessing no lands or other property, devoid of leadership, and in fact having none of the characteristics of an Indian band or tribe. To this contention we cannot assent. The bands did -cede their separate reservations and agreed to take allotments on the Eed Lake and White Earth Reservations, and thereafter participate upon an equal basis in the benefits to be derived from so doing. It was a transition from separate band organization to a unitary one, governed in precisely the -same manner and under precisely the same laws applicable to the control and disposition of Indian lands by the Government.
The participants in this consolidation were all tribal Chippewa Indians. The lands ceded were tribal lands. The Indian bands surrendered whatever advantage they possessed because of band organization in the interest of their brethren, and agreed that all the Chippewa Indians in Minnesota, irrespective of bands, should take alike in the great Chippewa estate in Minnesota.
The fact that subsequent to the cession the ordinary Indian tribal organization in all its detail did not prevail is, we think, unimportant. Subsequent to the cession the lands were disposed of as communal Indian lands, the funds were recognized as also communal, and the entire administration of the Indian estate was conducted upon the basis of tribal lands and funds. The benefits to accrue from the same vested without discrimination in all the Chippewas of Minnesota. This was not the creation of a new class; it was simply the amalgamation of an old one.
Aside from all that has been said, it is of much more importance to give attention to the plaintiffs’ contention that the defendant surrendered its plenary authority over Indian tribal lands and funds when the act of 1889 was approved. The contention is a novel one. It is, of course, conceded that this power and authority exist. Lone Wolf v. Hitchcock, 187 U. S. 553.
The plaintiff Indians argue that because Congress lacked the power to take the land of one of the bands and give it *31 to another, it therefore lacked the power to do what was done without the consent of the Indians, and thus surrendered its plenary power and authority over tribal Indian lands and funds. It is true Congress did not exert to the limit the power and authority it possessed when the act of 1889 was approved, but this fact does not import its nonexistence. The limitations of the power extend only to an impairment or destruction of vested rights. Gritts v. Fisher, 224 U. S. 640.
The lands and funds of the various bands of Indians were tribal and subject to the plenary power and authority of Congress. This fact is indisputable. Congress made annual appropriations for the bands and treated and recognized them as tribal. The Indians themselves made no claim to the contrary. When the Indians ceded the lands they transferred the title they possessed, and this transaction did not in any sense emancipate the Indians, render them sui juris, or dissolve the relationship of guardian and ward previously existing.
The act of 1889 expressly withholds from the Indians the administration of its provisions. Congress reserved the power and authority to administer it. Every provision of the law exhibits with positiveness the recognized inability of tribal Indians to adjust and settle this vast and valuable estate. Not a single provision of the act in any way imports •either a willingness or intent to surrender the power and authority Congress possessed in the premises, or to abandon its traditional and legal authority to care for the welfare and civilization of tribal Indians.
It is true that the act of 1889 contained a referendum •clause. It was not to become effective until approved by a certain number of the Indians and the President. This fact does not, however, change the established relationship of the defendant and the Indians. The mutual assent of the interested parties to the enactment of the act did not create a contract.
When Congress abandoned the policy of treating Indian 'Tribes as dependent nations with whom the Government made treaties respecting their tribal affairs, as it admittedly •did in 1871, it assumed and has since then continuously ex *32 ercised tbe power and authority to manage, control, regulate, and adjust tribal Indian affairs, including their lands and funds. The assumption of this plenary authority has been more than once approved by the Supreme Court. Lone Wolf v. Hitchcock, supra.
In the enactment of statutes similar to the act of 1889 designed to relieve and civilize Indian tribes, Congress did not intend to surrender this existing plenary power and authority if subsequent conditions exhibited an acute necessity to alter the terms of a pre-existing act so long as subsequent legislation did not take from the Indians vested rights. As to lands and funds remaining after the vesting of rights of property, and so long as the subsequent acts did not take from the tribe lands belonging to it and give them to strangers or appropriate them to the Government, the plenary power and authority of Congress over Indian tribal lands and funds exist.
The case of Gritts v. Fisher, supra, directly in point, negatives the contentions of the plaintiffs advanced in this case. The Supreme Court in deciding the above case said:
It is conceded, and properly so, that the later legislation is valid and controlling unless it impairs or destroys rights which the act of 1902 vested in members living September 1,1902, and enrolled under that act. As has been indicated, their individual allotments are not affected. But it is said that the act of 1902 contemplated that they alone should receive allotments and be the participants in the distribution of the remaining lands, and also of the funds, of the tribe. No doubt such was the purport of the act. But that, in our opinion, did not confer upon them any vested right such as would disable Congress from thereafter making provision for admitting newly born members of the tribe to the allotment and distribution. The difficulty with the appellants’ contention is that it treats the act of 1902 as a contract, when “it is only an act of Congress and can have no greater effect.” Cherokee Intermarriage Cases, 203 U. S. 76, 93. It was but an exertion of the administrative control of the Government over the tribal property of tribal Indians, and was subject to change by Congress at any time before it was carried into effect and while the tribal relations continued. Stephens v. Cherokee Nation, 174 U. S. 445, 488; Cherokee Nation v. Hitchcock, 187 U. S. 294; Wallace v. Adams, 204 U. S. 415, 423. [224 U. S. 648.]
*33 Section 74 of the act of 1902 (32 Stat. 716), the initiatory legislation subsequently changed by the act of April 26, 1906 (34 Stat. 137), as amended June 21, 1906 (34 Stat. 325, 340), involved in the Gritts v. Fisher case, supra, was submitted to the tribe for ratification. This section of the act of 1902 reads in part as follows:
This act shall not take effect or be of any validity until ratified by a majority of the whole number of votes cast by the legal voters of the Cherokee Nation in the manner following [32 Stat. 727].
The case of Sizemore v. Brady, 235 U. S. 441, involved the “original Creek Agreement.” The issue raised was similar to the one in this case. It was contended by the plaintiff that the original agreement was a grant in praesenti and vested absolute rights to allotments of Indian lands, and that Congress was powerless to impair or alter the original agreement. In deciding adversely to this contention the court said:
On the part of the maternal cousins it is contended that the provisions in the original agreement relating to the allotment and distribution of the tribal lands and funds were in the nature of a grant in praesenti and invested every living member of the tribe and the heirs, designated in the tribal laws, of every member who had died after April 1,1899, with an absolute right to an allotment of lands and a distributive share of the funds, and that Congress could not recall or impair this right without violating the due process of law clause •of the Fifth Amendment to the Constitution. To this we cannot assent. There was nothing in the agreement indicative of a purpose to make a grant in praesenti. On the contrary, it contemplated that various preliminary acts were to precede any investiture of individual rights. The lands and funds to which it related were tribal property and only as it was carried into effect were individual claims to be fastened upon them. Unless and until that was done Congress possessed plenary power to deal with them as tribal property. It could revoke the agreement and abandon the purpose to distribute them in severalty, or adopt another mode of distribution, or pursue any other course which to it seemed better for the Indians. And without doubt it could -confine the allotment and distribution to living mem *34 bers of the tribe or make any provision deemed more reasonable than the first for passing to the relatives of deceased members the lands and money to which the latter would be entitled, if living. In short, the power of Congress was not exhausted or restrained, by the adoption of the original agreement, but remained, the-same thereafter as before, save that rights created by carrying the agreement into effect could not be divested or impaired. Choate v. Trapp, 224 U. S. 665, 671 [235 U. S. 449, 450].
We need not go back and discuss either the necessity of each individual band of Chippewas assenting to the passage of the act of 1889, or whether as a legal proposition the estate of all the bands might have been adjusted and finally settled by the exertion of the plenary power and authority of Congress. It seems to us of little consequence to the solution of the issues presented by the record. We know what the individual bands did. We know that as tribal Indians they accepted all the benefits accruing to them under the act of 1889 and in accord with its terms. We know that they approved the act of 1889, and whatever may have been their rights under separate band organization we know they voluntarily surrendered them to acquire others under the act of 1889.
What we intend to hold and what we think the record sustains is that “About the beginning of the last century the Chippewas constituted one of the larger Indian tribes in the northerly part of the United States. In early treaties they were dealt with as a single tribe and were shown to be occupying a large area reaching from Lake Huron on the east to and beyond Lake Superior on the west. In later treaties they were regarded as divided into distinct bands; and particular bands — in some instances a single band and in others a limited plurality of bands- — -were recognized as occupying separate areas in Michigan, Wisconsin, Minnesota, and eastern Dakota, and as entitled to hold or cede the same independently of other bands and of the Chippewas as a whole.” Chippewa Indians v. United States, 301 U. S. 358, 360, 361.
The various bands acting independently did cede their tribal lands to the United States; pooled, as it were, all the *35 Chippewa Indian lands in Minnesota previously held by individual bands, and by so doing rendered them the communal Indian lands of all the Chippewa Indians of Minnesota. The bands by assenting to the act of 1889 returned to a single tribal organization precisely as the same had existed before their recognition as separate bands.
If Congress intended in 1889 to create a new Indian entity-possessing characteristics wholly different from a tribal one,, endowed with legal authority to receive the benefits of the sale and disposition of tribal lands and funds free from the-control and authority of Congress, it is the first time in the history of Indian legislation that this has been done. It was, indeed, a wide and unusual departure from the established Indian policy of the Government. It is clear to us. that Congress did not so intend.
The contentions of the plaintiffs as we understand them concern exclusively the rights of the Chippewa Indians of Minnesota and their issue living on the date stated in the-act of 1889 for the distribution of the so-called trust fund.. This must be so, for the Chippewa Indians of Minnesota now living and those who survived the enactment of the act of 1889 have participated in and received the monetary-benefits brought about by the Government’s legislation which depleted the fund, and in no way have suffered loss or-damage.
In other words, the present members of the Chippewa Indians of Minnesota cannot have a complaint, and if the: plaintiffs are to recover for the designated “remaindermen” they will have received not only the benefits of the so-callecL trust fund during all these years but the Government will be required to duplicate the distribution to their heirs at the-end of the fifty-year period. This conclusion we think is-inescapable.
We have considered with care the numerous cases cited in: the briefs of counsel and are absolutely unable to find one-which holds that under an act of Congress providing for the-settlement of Indian tribal estates a succeeding Congress is powerless to alter a former act, when after the enactment of the first act the succeeding one deems it essential for the good *36 of the tribe to exercise its plenary administrative power over unallotted Indian lands and undistributed Indian funds. Lone Wolf v. Hitchcock, supra; Winton v. Amos, 255 U. S. 373; United States v. Creek Nation, 295 U. S. 110; United States v. Mille Lac Band of Chippewas, 229 U. S. 498; Kadrie case, supra.
In the case of Cherokee Nation v. Hitchcock, 187 U. S. 294, 308, the Supreme Court held:
We are not concerned in this case with the question whether the act of June 28, 1898, and the proposed action thereunder, which is complained of, is or is not wise, and calculated to operate beneficially to the interests of the Cherokees. The power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine and is not one for the courts.
The established rule applies to the tribal funds of an Indian tribe or tribes whenever an existing Indian tribe challenges the administration of its estate under an act or acts of Congress.
The first claim of plaintiffs is for $232,011.21. Section 7 of the act of 1889 provided that the Government should advance to the Indians each year after the passage of the act the sum of $90,000, known as advance interest. These annual advancements were to continue until the permanent fund arising from the sale of surplus lands equalled or exceeded $8,000,000, less any actual interest accruing in the meantime.
The Government made annual appropriations of $90,000 in accord with the act for the fiscal years 1892 to 1911, inclusive, or a total sum of $1,890,000. On May 16, 1911, reimbursement was taken by the Government as follows: $896,246.93 from the permanent fund, and on later dates, $973,504.52 from the interest fund, or a total reimbursement of $1,869,751.45, resulting in a failure of the Government to obtain a full reimbursement of public money taken from the Treasury of $177.94.
*37 The plaintiffs insist that the Government in taking reimbursement for advanced interest payments took from the-permanent fund $232,011.21 more than the act of 1889 authorized. No contention is advanced that all the money involved was disbursed in any other way than for the exclusive benefit of the Indian tribe, nor is it contended that reimbursement, for the' sums appropriated by the Government was unauthorized, the only contention being that the permanent fund, under the act of 1889 was depleted to the extent noted, to the' prejudice of the remaindermen.
The annual Indian appropriation bill for 1911 contained among other provisions the following:
For advance interest to the Chippewa Indians in Minnesota, as required by section seven, Act of January fourteenth, eighteen hundred and eighty-nine, entitled “An Act for the relief and civilization of the Chippewa Indians in the State of Minnesota,” to be expended in the-manner required by said Act, ninety thousand dollars: Provided, That the amount of this appropriation and all moneys heretofore or hereafter to be appropriated for this purpose shall be repaid into the Treasury of the United States in accordance with the provisions of the-Act of January fourteenth, eighteen hundred and eighty-nine : Provided further, That the Secretary of the Treasury shall transmit to Congress on the first Monday in. December, nineteen hundred and ten, a statement, by tribes and funds, of all moneys appropriated by Congress since July first, eighteen hundred and seventy-five,, required by law to be reimbursed to the United States from Indian tribal funds held in trust or otherwise,, showing the extent to which such reimbursements have-been, or may now be accomplished [36 Stat. 276].
The wording of this portion of the appropriation act discloses that Congress in its conception of its obligations under the act of 1889 appropriated each year the $90,000 advance-interest payment without respect to the interest fund accumulating upon the permanent fund from year to year. Obviously, if Congress had been aware of the extent of interest accumulations it could have omitted these advance appropriations at least eight years sooner.
While technically it may be asserted that Congress did not strictly observe the provisions of the act of 1889, it is indis *38 putable that tbe present plaintiffs suffered absolutely no loss, and now seek to gain a benefit from a transaction which did them no harm whatever. The reason advanced by the Government is a weighty one. While advancements of interest were appropriated by the Government the sums advanced were not completely disbursed in any one fiscal year.
The bookkeeping system of the Treasury discloses two •separate accounts — one known as payment into the permanent fund and the other into the interest fund — and in the addition of unexpended balances as well as the addition and subtraction of sums from the interest fund the Secretary of the Interior made the reimbursements as he construed the act of 1889 to authorize. In the multitude of entries in a large and continuing account over a long term of years the Government is not to be charged with an error that results in no loss or damage to any living Indian.
The act of 1889 provided that from the proceeds of the sale of the ceded lands the Government should be reimbursed for carrying out the act. The plaintiffs do not challenge the amount the Government appropriated and disbursed for this purpose. The present item in suit is a claim for $203.17, an alleged overreimbursement from the permanent fund.
In view of our judgment and opinion in this case, the defendant’s defense to this item is invulnerable, and in no event was the reimbursement taken in excess of $25.23. There were a number of appropriations made by Congress for the benefit of the plaintiffs, in each of which it was expressly provided that the Government should be reimbursed therefor from the plaintiffs’ funds. The act of 1889 contained certain provisions which obligated the Government to provide sufficient funds for administering the act, and for these sums the Government was to be reimbursed. Obviously, no additional legislation was required to authorize •such reimbursements. The sums for which the Government took reimbursement, in addition to these, were appropriations made by Congress concerning the welfare and civilization of the tribe and providing that they should be reimbursed for the same.
The plaintiffs seek to limit this item to one expenditure for carrying out the act of 1889 and object to treating the *39 reimbursable items as a whole. This position is untenable. Congress retained its plenary power and authority over Indian tribal lands and funds and provided that the sums appropriated were to be reimbursed from the Indian funds. See Finding 9.
The Government by appropriation acts appropriated $19,182.50 for an Indian school at Leech Lake, Minnesota; $30,453.79 for a drainage survey of ceded lands; $35,000 for an Indian school at Red Lake, Minnesota, and $17,974.54 for school buildings for the Chippewas of Minnesota. In each appropriation act it was expressly provided that the sums thus appropriated and disbursed should be reimbursed to the Government out of the funds involved in this case. To hold that the act of 1889 precluded the Government from taking ample Indian funds of a tribe for the above civilizing purpose is contrary to established precedents.
In the discussion of items which are to follow it is not essential to enter into the details of accounting. The findings point out the sums involved, and we have adverted to typical items illustrative of all involved. As previously stated, the plaintiffs’ case rests upon a lack of Congressional authority to take from the funds created by the act of 1889 any sum not expressly stated to be reimbursable. If this is the principle of established law, manifestly the plaintiffs are entitled to recover.
Aside from reimbursable sums mentioned in the act of 1889, additional items in suit involve reimbursement of large sums appropriated by Congress and expended for welfare and civilization of the tribe, which were either not authorized by the act or exceeded the sums authorized. One item is education. The act of 1889 expressly authorized the expenditure of one-fourth of interest accumulations during the fifty-year period to be expended under the direction of the Secretary of the Interior for education. It is alleged and proved that more than one-fourth was expended, and subsequently the Government was reimbursed from the fund.
In the process of extending instrumentalities for obtaining an advancement of civilization, education becomes a *40 leading and controlling factor. If Congress adopted the-policy subsequent to 1889 of reimbursing appropriations made to Indian tribes for this purpose out of available Indian tribal funds, the courts may not intervene. The act of 1889 did not create a contract, and Congress did not by its. enactment render the Government powerless to provide as in its wisdom it deemed appropriate for the education of the-Indians. It retained control of unexpended tribal funds.
It is asserted that facilities for education inured to individual Indians and not to the tribe. It is unnecessary to-combat the argument. The Chickasaw Nation v. United States, 87 C. Cls. 91. Agricultural implements, clothing for the needy, provisions and rations for the hungry, livestock, and food for their maintenance; fuel and light for Indian homes; hospitals for the sick; funds for the burial' of the dead, as well as innumerable other items restricted exclusively to the status of an Indian tribe, may, when Congress so prescribes, be paid for out of Indian tribal funds, irrespective of the provisions of the act of 1889.
In 1911 Congress adopted the policy of defraying the expense of Indian agencies and other costs of governmental activities in Indian affairs, either in whole or in part, out of available Indian tribal funds. In this case Congress observed this policy and provided that sums expended for this-purpose should be reimbursable. The plaintiffs contest the item by a contention predicated upon governmental policy obtaining in former years. We will not review the origin and purpose of Indian agencies; it is sufficient to- state that Congress determines the Indian policy and we may not challenge it.
Because Congress appropriated as it did between the years 1890 and 1910 the sum of $2,350,559 for the relief and civilization of the Chippewa Indians of Minnesota and directed that the Treasury should obtain reimbursement of this sum “out of the proceeds of sales of land ceded by the Chippewa Indians under the act of 1889, or out of the proceeds of the-sale of their lands,” it becomes incumbent upon the plaintiffs; to establish a diversion of the funds to purposes other than the relief and civilization of the Indians.
*41 The record to warrant a recovery must not conclude with a mere showing that the provisions of the act of 1889 were not strictly complied with. The act of 1889 in its preamble discloses its purpose, and assuredly Congress was not compelled to permit a large population of tribal Indians to stand in need of the facilities of relief and civilization, when the tribe itself possessed ample and sufficient funds to supply the same. Under plaintiffs’ contention the status of the tribe remained m statu quo for at least a half century if Congress in the meantime had refused appropriations.
Per capita distributions were all made* to the Indians from the funds in accord with the following acts of Congress: 39 Stat. 135; 42 Stat. 221; 43 Stat. 1; 43 Stat. 798; 44 Stat. 7. Manifestly it was essential to make them. Changing economic and social conditions obviously inspired the legislation which altered the provisions of the act of 1889. The present generation of Indians, as well as many who have passed on, accepted these benefits and they were beneficial, and they did not then object that the so-called trust fund was being unlawfully depleted. It was not until after all these benefits had been fully realized by the tribe that solicitude was manifested for the designated remaindermen.
The plaintiffs contest an expenditure made by the Government for a drainage survey of ceded lands, and repeating the provisions of the act of 1889 point out that no provision is found therein authorizing this proceeding. It is, of course, true that no express provision authorizing the survey is found in the act. It was accomplished under congressional authority, and what was done inured to the Indians.
The extent of the funds to be realized from the sale of surplus lands was dependent upon their classification. Swamp lands if susceptible. to drainage would enhance in value, and what the Government did was for the express benefit of the tribe. To bring the swamp areas into a state of cultivation was in direct accord with the intent of the act of 1889 which by express terms contemplated, if it did not express, an intent to bring the estate to the point of its greatest value.
*42 Out of the fund arising from the act of 1889 there was expended from 1905 to 1927 the total sum of $8,758,030.59. For the relief and civilization of the Indians for the years 1912 to 1927 the Interior Department expended approximately $2,526,267.74, and the per capita distributions during this same period totaled $5,684,341.60, a total disbursement of $8,210,609.34 either authorized by acts of Congress or disbursed in accord with the provisions of the act of 1889.
The plaintiffs subtract $8,210,609.34 from $8,758,030.59, which leaves $547,421.25, and upon this calculation insist that $547,421.25 was taken from the Indian fund without any authority either from Congress or the provisions of the act of 1889. No charge is made that this sum was disbursed for any other purpose than for the tribe’s benefit, and authority must exist for the disbursements made.
The defense, and it is a conclusive one, discloses, and the record sustains the fact, that the report of the Comptroller General shows in detail all expenditures made for the benefit of the tribe from 1905 to 1927, inclusive. During the same period of time expenditures for the survey, allotment, and sale of the ceded lands totaled $669,606.34, and were expressly authorized by the provisions of the act of 1889.
The $8,210,609.34 represents expenditures authorized by acts of Congress and, to say the least, the court would not be warranted in holding that the $547,421.25 was not part of the expenditures authorized by the act of 1889 and did not exact congressional authority. In other words, aside from what has been said, the record fails to establish the contention advanced with that degree of certainty required to warrant a judgment.
In the Kadrie case heretofore cited, this language is used in the opinion of the Supreme Court:
When the act of 1889 was passed the Chippewa Indians in Minnesota comprised eleven bands or tribes occupying ten distinct reservations in that state in virtue of treaties or Executive orders. Collectively, they were regarded as a single tribe and commonly called the Chippewas of Minnesota. They numbered about 8,300, and their reservations contained approximately 4,700,000 acres. They were tribal Indians, under the guardianship of the United States, and held their reservations as tribal lands [p. 208.]
*43 Also, on page 221 of the same opinion, the court said:
The second question is more easily answered, for not only does the act of 1889 show very plainly that the purpose was to accomplish a gradual rather than an immediate transition from the tribal relation and dependent wardship to full emancipation and individual responsibility but Congress in many later acts — some near the time of the decision in question — has recognized the continued existence of the tribe. * * * With the tribe still existing the criticism by counsel for the relators of the Secretary’s decision in other particulars loses much of its force. [Italics inserted.]
To sustain the plaintiffs’ contentions exacts a holding from this court that the act of 1889 accomplished an “immediate emancipation” of the plaintiff Indians, had the effect of dissolving the relationship of guardian and ward, and placed the Government in the position of being absolutely unable to-administer their tribal affairs. This we can not do.
We regret the necessity for lengthy and involved findings of fact, but find no way to avoid them. If, however, we are correct in holding the lands and funds to be tribal ones subject to the plenary power and authority of the Government over the same, the detailed accounting becomes immaterial.
The petition will be dismissed. It is so ordered.
Whalet, Judge; Williams, Judge; Littleton, Judge; and GREEN, Judge, concur.
supplemental opinion
Booth, Chief Justice,
delivered the opinion of the court:.
The plaintiffs and defendant file motions to amend the findings and for a new trial. The defendant’s motion does-not challenge the judgment or opinion of the court. It is confined to amendment of the findings to make some of them more positive and to clarify others. The plaintiffs’ motion alleges both errors of fact and law and points out the same,, and while the judgment and opinion of the court are challenged, a request for a reargument of the case is not asked.
The plaintiffs contend that one of their principal claims has been inadequately disclosed in the court’s findings, and *44 additional findings are may be so stated as not to foreclose a presentation of the same in the event of a review of the court’s judgment. The request is a reasonable one and it may be the court did not find in extenso with respect to the facts involved. We grant plaintiffs’ motion in part and amend our findings accordingly.
Plaintiffs’ contention with respect to per capita payments made to the Indians under the acts appended to this opinion .is thus stated: “Disbursement of large portions of the principal fund, prior to the termination of the fifty-year trust period, to persons then in being, many of whom are now dead, and who, so far as still living, may or may not survive to the end of the trust period so as to be entitled to share in the final distribution of principal to ‘all said Chippewa ’.Indians and their issue then living.’ ”
The Secretary of the Interior did, in accord with the acts of Congress attached hereto, make per capita distributions from the funds of the Indians in the Treasury to the amount of $5,684,341.60 and manifestly this decreased to this extent the amount of the fund available for distribution at the end of the fifty-year period. Hence the issue presented by the requested findings is identical with plaintiffs’ contentions as to all claims preferred.
If a beneficiary under the acts received a per capita payment from the principal fund and thereafter died before the expiration of the fifty-year period there can be no doubt as to the financial consequences to the issue of the Indian at the end of the fifty-year period. The final result, so far as the distributees mentioned in the act of 1889 are concerned, is in no way obscure. That, however, is not the issue. If Congress determined to utilize the existing fund for a generation of tribal Indians who in their judgment needed it to ward off the hardships of life, and who were really the creators of the fund, it was a matter for Congress to determine and not the courts.
Congress did not arbitrarily or capriciously deplete the so-called trust fund in the payment of a per capita distribution. On the contrary, it submitted to the Indians the *45 qüestion as to whether they wished or disapproved it. A referendum appeared in every act but one authorizing the same. Obviously, the response to the referendums indicated immediate necessities and displeasure with the prolonged period involved in the disposition of the Indian tribal fund.
It is manifestly beyond the jurisdiction of the court to express agreement or disagreement with the provisions of the act of 1889. Congress possesses the authority to care for tribal Indians, and, under established precedents we have cited, the courts may not question its discretion or the exercise of the plenary power they have of right. If the case is restricted to a matter of accounting under the act of 1889 the findings tell the story.
The plaintiffs say that they appear in this case under the special jurisdictional act for and on behalf of “all those entitled to share in the final distribution,” meaning all those entitled to receive a share of the fund when the trust period has expired, and it is insisted that the damages suffered by this class occasioned in part by the per capita payments from the fund “are to be here redressed.”
If the contention advanced is predicated upon the theory that the jurisdictional act creates rights and consequent liabilities, or by its terms recognizes existing rights under the act of 1889, it is answered by the decision of the Supreme Court in the Mille Lao Band of Chippewa Indians v. United States, 229 U. S. 498, 500, wherein the following rule applicable to the construction of special jurisdictional acts was established:
The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for the adjudication of the claim according to applicable legal principles. Nor does it contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give effect to their plain import, because of any supposed injustice to the Indians. United States v. Old Settlers, 148 U. S. 427, 469; United States v. Chootaw &c Nations, 179 U. S. 494, 735; Sac and Fox Indians, 220 U. S. 481, 489.
*46 We find nothing in the record to sustain a finding that the per capita payments here involved were made to the then beneficiaries of interest distributions. The acts authorizing the payments use the terms “permanent” and “principal fund.” The sums distributed and the extent of the Indian enrollment negative the fact that the distribution and payments were limited to the interest fund. The variation in. sums as to different years is attributable in part to the difference in the amount of per capita payments authorized by the acts.
If the per capita payments were authorized by the act of 1889 and were intended only for beneficiaries of the interest distributions the Secretary of the Interior did not need special legislation to make such distributions. The act of 1889 conferred such authority. The special acts are susceptible to but one construction in our opinion, and that is Congress intended and clearly expressed such an intention to take from available funds in the Treasury to the credit of the Indians and distribute designated amounts to them per capita irrespective of the source from which the fund emanated.
The taking of a receipt from each distributee was a precautionary measure adopted by the Secretary of the Interior in formulating his regulations. This procedure has, we think, nothing to do with the solution of the issues in this case. The Secretary was authorized to administer and pay out a large sum of money and the maintenance of strict regulations involving accounting was indispensable. As a matter of fact, the regulations promulgated by the Secretary were in no way unusual.
Plaintiffs argue that notwithstanding per capita payments made to individual Indians who had died prior to June 30, 1927, and to others now living who may survive the trust period, the entire amount distributed under the special acts should be appropriated by Congress and restored to the so-called trust fund. As to the survivors, the defendant is fully protected by receipts, and as to decedents the payment was unauthorized.
If the judgment of the court is erroneous and plaintiffs’' contention hereafter sustained, the above argument will be *47 come important; it is now a stated principle of accounting, and may become important in fixing the sum to be appropriated if this court is wrong in its adjudication of the case.
We have gone carefully into the record in considering the motions for a new trial, and we have added this opinion to the original one because the plaintiffs in the brief apparently feel that we neglected both in the findings and opinion to attach to the subject-matter of per capita payments the importance it deserves. On page 37 of the original opinion in the first line of the second paragraph the word “reimbursable” will be stricken out. (See page 41.)
Plaintiffs’ request for a new Finding 23 is denied. The subject-matter of the finding involves a statement of existing laws concerning the public school system of Minnesota, a matter of which the courts take judicial notice.
The determinative issue in this case, deducible from the facts involved, depends as we see it upon the one important legal principle: If Congress in enacting the act of 1889 precluded a subsequent Congress from administering the act of 1889 in accord with the existing condition of tribal Indians, and by legislation diverted the fund established by prior legislation in the interest of those then in need of it, does legal precedent exact a reimbursement to the fund of the sums expended? If Congress is without authority to care for the immediate needs of tribal Indians, and yet does so, is a legal liability imposed upon the United States to appropriate again sufficient funds to carry into effect the provisions of an act which by its terms would leave an existing Indian population in what Congress has determined to be a condition of distress and necessity? What we hold is that Congress possesses the exclusive and plenary authority to deal with tribal Indian lands and funds as in its wisdom it deems just. It is a matter within the exclusive jurisdiction of Congress, and if the legislation does not impair vested rights or appropriate Indian property for a public purpose the courts are absolutely without jurisdiction. Lone Wolf v. Hitchcock, 187 U. S. 553.
The motions for a new trial are overruled and the motions to amend the findings are allowed in part and overruled in part. The former findings are withdrawn, and *48 amended findings this day- filed, the judgment and former opinion to stand. It is so ordered.
Whalet, Judge; Littleton, Judge; and GREen, Judge, concur.
Williams, Judge, took no part in this decision.
APPENDIX
The act of May 18, 1916, 39 Stat. 123, 135, provides, in part as follows:
That the Secretary of the Interior, under such rules and regulations as he may prescribe, is hereby authorized to advance to any individual Chippewa Indian in the State of Minnesota entitled to participate in the permanent fund of the Chippewa Indians of Minnesota one-fourth of the amount which would now be coming to said Indian under a pro rata distribution of said permanent fund: Provided, That the Secretary of the Interior, under such rules and regulations as he may prescribe, may use for or advance to any Chippewa Indian in the State of Minnesota entitled to share in said fund who is incompetent, blind, crippled, decrepit, or helpless from old age, disease, or accident, one-fourth of the amount which would now be. coming to said Indian under a pro rata distribution of said permanent fund: Provided further, That any money received hereunder by any member of said tribe or used for his or her benefit shall be deducted from the share of said member in the permanent fund of the said Chippewa Indians in Minnesota to which he or she would be entitled : Provided further, That the funds hereunder to be paid to Indians shall not be subject to any lien or claim of attorneys or other third parties.
The act of November 19, 1921, 42 Stat. 221, provides as follows:
That the Secretary of the Interior be, and he is hereby, authorized to withdraw from the Treasury of the United States so much as may be necessary of the principal fund on deposit to the credit of the Chippewa Indians in the State of Minnesota, arising under section 1 of the act of January 14, 1889 (Twenty-fifth Statutes at Large, page 642), entitled “An Act for the relief and civilization of the Chippewa Indians in the State of *49 Minnesota,” and to make therefrom a per capita payment, or distribution, of $100 to each enrolled member of the tribe, under such rules and regulations as the said Secretary may prescribe: Provided, That the money paid to the Indians as authorized herein shall not be subject to any lien or claim of attorneys or other parties: Provided, That before any payment is made hereunder the Chippewa Indians of Minnesota shall, in such manner as may be prescribed by the Secretary of the Interior, ratify the provisions of this act and accept the same.
The act of January 25, 1924, 43 Stat. 1, provides as follows:
That the Secretary of the Interior be, and he is hereby, authorized to withdraw from the Treasury of the United States so much as may- be necessary of the principal fund on deposit to the credit of the Chippewa Indians in the State of Minnesota, arising under section 7 of the Act of January 14,1889 (Twenty-fifth Statutes at Large, 642), entitled “An Act for the relief and civilization of the Chippewa Indians in the State of Minnesota,” and to make therefrom a per capita payment or distribution of $100 to each enrolled member, of the tribe, under such rules and regulations as the-said Secretary may prescribe: Provided, That before any .payment is made hereunder the Chippewa Indians of Minnesota shall, in such manner as may be prescribed by the Secretary of the Interior, ratify the provisions of this Act and accept same: Provided further, That the money paid to the Indians as authorized herein shall not be subject to any lien or claim of attorneys or other parties.
The act of January 30, 1925, 43 Stat. 798, provides as folloAvs:
That the Secretary of the Interior be, and he is hereby, authorized to withdraw from the Treasury of the United States so much as may be necessary of the principal fund on deposit to the credit of the Chippewa Indians in the State of Minnesota, arising under section 7 of the Act of January 14, 1889 (Twenty-fifth Statutes at Large, 642), entitled “An Act for the relief and civilization of the Chippewa Indians in the State of Minnesota,” and to make therefrom a per capita payment or distribution of $50 to each enrolled member of the tribe, under such rules and regulations as the said Secretary may prescribe: Provided, That before any *50 payment is made hereunder the Chippewa Indians of Minnesota shall, in such manner as may be prescribed by the Secretary of the Interior, ratify the provisions of this Act and accept same: Provided further, That the money paid to the Indians as authorized herein shall not be subject to any lien or claim of attorneys or other parties.
The act of February 19, 1926, 44 Stat. 7, provides as follows :
That the Secretary of the Interior be, and he is hereby, authorized to withdraw from the Treasury of the United States so much as may be necessary of the principal fund on deposit to the credit of the Chippewa Indians in the State of Minnesota, arising under section 7 of the Act of January 14,1889 (Twenty-fifth Statutes at Large, 642), entitled, “An Act for the relief and civilization of the Chippewa Indians in the State of Minnesota,” and to make therefrom a per capita payment or distribution of $50 to each enrolled member of the tribe, under such rules and regulations as the said Secretary may prescribe: Provided, That before any payment is made hereunder the Chippewa Indians of Minnesota shall, in such manner as may be prescribed by the Secretary of the Interior, ratify the provisions of this Act and accept same: Provided further, That the money paid to the Indians as authorized herein shall not be subject to any lien or claim of attorneys or other parties.

 See page 47.