MaddeN, Judge,
delivered the opinion of the court:
The Senate of the United States has by resolution referred to this court the question of the merits of a claim of the Osage Tribe of Indians. Senate Bill 2926, proposing to appropriate $1,975,000 to pay the claim, was pending in the Senate when the resolution was adopted.
The plaintiff, the Osage.Tribe, owned and occupied in common a reservation which now is Osage County, Oklahoma. Pursuant to a statute of 1906, the land, excluding the minerals, was allotted to the enrolled members of the tribe, each receiving about 500 acres, of which 160 acres was to be selected as a homestead, to be non-taxable and inalienable until otherwise provided by Congress. The balance of each Indian’s land, called surplus land, was to be non-taxable for three years and inalienable for 25 years unless the Indian was an adult and was, upon petition and investigation, granted a certificate of competency, in which case his surplus land was to be taxable and alienable.
The minerals, including oil and gas, were not made subject to allotment but were retained in Tribal ownership, the Tribe being given power to make mineral leases, with the approval of the Secretary of the Interior, and the royalties to go into the common funds of the Tribe which were held by the Government. Oil and gas leases were made, and royalties were paid by the producing companies. The state was unable to tax the production, either directly or indirectly, because the minerals were under the protection of the Federal Government. Indian Territory Illuminating Oil Co. v. State of Oklahoma, 240 U. S. 522; Large Oil Co. v. Howard, 248 U. S. 549.
By section 5 of the act of March 3,1921,41 Stat. 1249, Congress gave to the state of Oklahoma authority to levy and collect a gross production tax on oil and gas produced in Osage County, Oklahoma, the oil companies to pay the tax on the companies’ share of the production, and the Secretary *552 of the Interior to pay the tax on the Tribe’s royalty share. The state, under this authority, levied such a tax, at 3 per cent until 1935, then at 5 per cent. The state statute provided for the return by the state to the county of origin of a specified proportion of the tax, and Osage County received some $4,500,000 out of a total state tax, on oil and gas produced in the county, of some $19,000,000, from 1921 to 1940.
Section 5 of the act of March 3,1921, contained, in addition, a proviso that the Secretary of the Interior should pay, in addition to what has been described above, one per cent of the royalties received by the Tribe, to Osage County “which sum shall be used by said county only for the construction and maintenance of roads and bridges therein: * * *” Pursuant to this direction, the Secretary paid, from 1921 to 1940, $1,092,338.17 to Osage County, which used the money for roads and bridges.
The Tribe is seeking the refund by the Government of this amount, with interest. It asserts that the proviso to section 5 of the act of 1921 was unconstitutional in that it deprived the Tribe of its property without due process of law, and took the Tribe’s private property for public use without just compensation, both in violation of the Fifth Amendment. The Tribe sees the proviso as nothing more than a donation by the Government of money, which it held in trust for the Tribe, to the county of Osage for a public purpose. The Government urges that the Tribe received a special benefit from the expenditure of the money for roads and bridges in the county, and that it was, therefore, within the constitutional power of Congress to direct that the funds be so spent.
We think that the proviso was not unconstitutional. When it was adopted, the Tribe owned all the oil and gas in place in the county, and was receiving all the royalties that were being paid. The minerals constituted, no doubt, a large proportion of the taxable wealth of the county. If Congress had authorized the county to lay a road and bridge tax of one per cent on oil royalties in the county, that would have been a constitutional tax, though, because of communal ownership, there would have been only one taxpayer, the Tribe. A leg *553 islature or a taxing body may make a rational classification of property for taxing purposes, without violating the Federal Constitution. Hart Refineries v. Harmon, Treasurer, 278 U. S. 499. The express direction in the proviso to section 5 that the Secretary of the Interior pay to the county what Congress could have validly authorized the county to collect in taxes was not, in substance, different from an authorization to levy a tax, though it was not, technically, a tax. The payment would hardly be unconstitutional if a tax having the same financial consequences would not have been.
In addition to what has been said, we think that there is merit in the Government’s contention that the Tribe received a special benefit from the expenditure of its funds. In 1921 when the proviso in question was adopted, the Tribe owned all the minerals in the county, and, as the law has now been amended, will continue to own them until 1983. The construction and maintenance of roads and bridges would increase the value of the minerals. The plaintiff urges that most of the land had been leased for oil and gas before 1921; the bonuses had been agreed on and paid, and the royalties fixed, so that the benefits from improved highways went to the oil company lessees rather than to the Tribe. To what extent this is true, we do not know, but to whatever extent the land had not been leased in 1921, and to whatever extent additional production on existing leases has taken place or will take place because the properties are more accessible by reason of improved highways, the Tribe has received a benefit. Furthermore, in 1906 the Tribe owned all the land in the county. Under the Allotment Act of 1906, the land, not including the minerals, was allotted to the individual members of the Tribe. Each Indian’s homestead, which comprised about one-third of his land, was made permanently inalienable and non-taxable, until Congress should otherwise direct. Here then, was about one-third of the land in the county, and the best third, which could contribute nothing to local improvements. The surplus, or non-homestead lands, allotted to individual Indians, were non-taxable for three years, and inalienable for twenty-five years, except for the *554 probably unusual cases of adult Indian owners who had petitioned for, and after investigation, had been given certificates of competency. In 1921, then, most of the lands of the county were probably still owned by the Indians, who were the same persons who, as a Tribe, owned the oil and gas royalties. The benefits of more convenient use and of increases in value of the land in the county, which would result from improved highways, would, then, go principally to the Indians, the persons who, as a Tribe, owned the royalties.If money was to be raised for roads and bridges, it would seem that taxes on the lands of the Indians, or a contribution from their royalties in the Tribal fund, would have been the two most promising sources. But a road tax on the lands in the county would have, in reality, been paid by the same people, largely, whose money was used to make the payment here complained of.
The power of Congress, in its management of the funds and property of the Indians, is broad, and the wisdom, or lack of it, will not be reviewed by the courts, so long as it is management, and not spoliation, that is involved. Chippewa, Indians of Minnesota v. United States, 88 C. Cls. 1; Cherokee Nation v. Hitchcock, 187 U. S. 294, 308. Compare Shoshone Tribe v. United States, 299 U. S. 476, 498.
Our conclusion is that the proviso in section 5 of the act of March 3,1921, 41 Stat. 1249, was not unconstitutional, and that the Osage Tribe of Indians have no legal or equitable right to recover from the United States the money paid to Osage County, Oklahoma, pursuant to that proviso.
It is ordered that the special findings of fact herein and the foregoing opinion of the court be certified to the Senate of the United States in accordance with Senate Resolution 288, July 1,1940, and section 151 of the Judicial Code (United States Code, title 28, sec. 257).
WhitaKER, Judge; Littleton, Judge; and Whalet, Chief Justice, concur.
Jones, Judge, took no part in the decision of this case.