STATE OF WISCONSIN *v.* LANE, SECRETARY OF THE INTERIOR.

IN EQUITY.

No. 7, Original.   Argued December 11, 1917.—Decided January 7, 1918.

The grant of sections numbered 16, for school purposes, made by § 7 of the Enabling Act of August 6, 1846, c. 89, 9 Stat. 56, to the State of Wisconsin, was not an unconditional grant *in præsenti;* it was subject to the right of Congress to make other disposition of the land before the sections became identified by surveys finally approved, leaving the State the right to obtain other sections by way of indemnity.

By the treaty of October 18, 1848, 9 Stat. 952, the Menominee Indians ceded to the United States their land-holdings in Wisconsin in exchange for other lands farther west, and a sum of money; but, dissatisfied with the new lands and desiring to stay in Wisconsin, they remained upon the ceded lands during the period of two years allowed by the treaty, and extensions granted thereunder by the President, until, by action of the Indian Department and pursuant to an act of Congress appropriating money for the purpose, they were removed in 1852 to another tract in Wisconsin, selected for their reservation. This removal was at first referred to in the act as temporary, but the Wisconsin legislature, in 1853, assented to their remaining on the tract, and by the treaty of May 12, 1854, 10 Stat. 1064, for the purpose of acquiring the new lands as a permanent home, the Indians relinquished the lands assigned them by the treaty

of 1848, and the United States set apart for their home, to be held as
Indian lands are held, a reservation including part of the reservation
of 1852, with some additional townships. *Held*, that sections num-
bered ·16, which were embraced by both reservations but were not
identified by finally approved surveys until after the reservation of
1852 was made, were by that reservation and the reservation of
1854 "disposed of" within the meaning of the school section grant
in the Wisconsin enabling act, and that other sections numbered 16,
embraced by the later reservation only, but lacking such identifica-
tion at its creation, were likewise disposed of; and, as all these sec-
tions remained in reservation and subject to the continuing occu-
pancy and rights of the Indians, the State had acquired no title to
them and could not restrain the cutting of timber on them by or.in
the interest of the Indians.

Decree for defendant.


THE case is stated in the opinion.


*Mr. John C. Thompson* and *Mr. R. A. Hollister,* with
whom *Mr. Walter C. Owen,* Attorney General of the State
of Wisconsin, and *Mr. M. G. Eberlein* were on the briefs,
for complainant.


*Mr. C. Edward Wright,* with whom *Mr. Charles D.
Mahaffie,* Solicitor for the Department of the Interior, was
on the brief, for defendant.


MR. JUSTICE DAY delivered the opinion of the court.


This is an original suit brought by the State of Wisconsin
claiming title under the school land grant to the State to
sections 16 in certain townships in the Menominee Indian
Reservation, which lands are alleged to belong to the
State or its grantees. The bill seeks to enjoin the de-
fendant, the Secretary of the Interior,[1] and through him
the Indian occupants of the land, from cutting timber

---

[1] The jurisdiction in this case is founded upon the statute set forth
in *Minnesota* v. *Hitchcock,* 185 U. S. 373, 387.

or committing waste thereon. The townships in controversy are numbers 29 and 30 in ranges 13, 14 and 15; township 29 in range 16; township 28 in ranges 15 and 16. These townships are all included in the treaty reservation of 1854, and those in ranges 15 and 16 also in the reservation of 1852; which treaty and reservations are hereinafter considered.

The question to be decided is whether the school land grant shall prevail over the rights of the Indian occupants.

The enabling act of Wisconsin was approved August 6, 1846, 9 Stat. 56. The State was admitted to the Union on May 29, 1848. The enabling act, § 7, provides: "That section numbered sixteen in every township of the public lands in said State, and where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools."

As to the rights of the Indians, it appears that they had occupied a large territory in the State of Wisconsin, and by various treaties, not necessary now to be dwelt upon, had made cessions to the United States. In 1848 the Indians made a treaty [October 18, 1848, 9 Stat. 952] ceding the remainder of their lands in Wisconsin to the United States, for which they received lands farther west and the sum of $350,000. This treaty was ratified January 23, 1849. By its terms the Indians were permitted to remain on the ceded lands for two years from October 18, 1848, and until notified by the President that the same were wanted. The Indians did not remove to the West, and in August, 1850, petitioned the President for leave to remain on some of the ceded lands. In their petition the Indians set forth the unsatisfactory character of the lands granted to them in the West, and their desire to remain in Wisconsin. On September 5, 1850, the President gave the Indians permission to remain upon the ceded lands until June 1, 1851; this time was

subsequently extended by the President to October 1, 1852. On September 30, 1851, the local Superintendent of Indian Affairs reported to the Commissioner of Indian Affairs that in pursuance of instructions he had explored the country on the Wolf and Oconto Rivers in Wisconsin for a location for the Menominee Indians, and for that purpose recommended a rectangular tract of land; this tract of land was to commence at the southeast corner of township 28 on the range line between 19 and 20 and run west 30 miles, north 18 miles, and thence back east and south to the place of beginning. The tract embraced 15 townships, 6 of which on the west are included within the limits of the lands described in the treaty of 1854, hereinafter referred to.

On August 30, 1852, Congress appropriated money for the removal of the Indians to the lands designated by the Superintendent. 10 Stat. 41, 47. On November 30, 1852, the Commissioner of Indian Affairs reported to the Secretary of the Interior that the removal of the Menominee Indians, as contemplated by the act of Congress passed the preceding session, had been satisfactorily effected, and that the whole tribe had been concentrated on the designated territory between the Wolf and Oconto Rivers, a location with which they were well pleased, and on which they were anxious to be permitted to remain permanently.

On February 1, 1853, the State of Wisconsin by joint resolution of its legislature gave its assent to this removal, in the following terms:

"That the assent of the State of Wisconsin is hereby given to the Menominee Nation of Indians to remain on the tract of land set apart for them by the President of the United States, on the Wolf and Oconto Rivers, and upon which they now reside, the same being within the State of Wisconsin aforesaid, and described as follows, to wit:

"Commencing at the southeast corner of township 28

north, range 19, running thence west thirty miles, thence north eighteen miles, thence east thirty miles, thence south 18 miles, to the place of beginning."

On November 26, 1853, the Commissioner of Indian Affairs made a report in which he said that by the treaty of 1848 the removal of the Menominee Indians to a place west of the Mississippi River was contemplated, but that it was thought preferable to concentrate them on the Upper Wolf and Oconto Rivers in the State of Wisconsin, and suggested, among other things, that the Indians could properly remain where they were for many years, without interference with the white population; suggesting, however, that, if such arrangement were to be of a permanent character, a new convention should be made with them, which would be necessary for their relinquishment of the country given to them by the treaty of 1848. This recommendation probably gave rise to the treaty of 1854 [May 12, 1854, 10 Stat. 1064], by which the Indians, for the recited purpose of acquiring the new lands for a permanent home, agreed to relinquish to the United States all lands assigned to them by the treaty of October 18, 1848; in consideration of which cession the United States agreed to give to the Indians for a home, to be held as Indian lands are held, "that tract of country lying upon the Wolf River, in the State of Wisconsin, commencing at the southeast corner of township 28 north, of range 16 east, of the fourth principal meridian, running west twenty-four miles, thence north eighteen miles, thence, east twenty-four miles, thence south eighteen miles, to the place of beginning—the same being townships 28, 29 and 30, of ranges 13, 14, 15 and 16, according to the public surveys." This tract embraced six of the townships included in the Indian reservation of 1852, and six townships to the west thereof. The sixteenth sections in five of the former and four of the latter are here in controversy.

It appears that as to three of these townships the surveys were not approved until February 20, 1854, and as to the other townships the surveys of two were approved October 11, 1854, and of the others on dates ranging from February 6, 1855, to October 3, 1891.

It is evident from a consideration of the terms of the enabling act, section seven, that Congress did not make an unconditional grant *in praesenti* to the State of the school sections; the terms of the grant are that the sections "shall be" granted. Moreover, the grant contemplated that Congress might make other disposition of the lands. The State of Wisconsin's right to the lands in controversy was to be subordinate to such disposition; in which event the State should seek indemnity in other lands for the loss of school sections.

The Menominee Indians by the treaty of 1848 gave up their holdings in Wisconsin, but were not removed to the lands provided for them in the West. They had the privilege of remaining in Wisconsin for two years and until notified by the President that the lands were wanted, this permission was extended, ultimately until October, 1852, in the meantime the Indians were located by the action of the Superintendent of Indian Affairs, and by the act of Congress, with the approval of the President, upon the reservation created in 1852. True, the act of Congress appropriating money for the removal referred to the temporary character of the location, but they were thus located subject to the control of Congress, and, as we have seen, with the consent of the State, if that were needed.

We think this recited action was a disposition, prior to survey, of the school sections, which was clearly within the authority of Congress to make and sanctioned by the terms of section seven of the enabling act. This action being before survey took these lands out of the scope of the grant for school purposes, and made them subject

to ultimate disposition by Congress for the benefit of the Indians. This was accomplished by the treaty of 1854 which adds to the reserved lands six townships on the west and includes the six westerly townships of the reservation of 1852. That treaty is comprehensive in its terms, it recites the unwillingness of the Indians to remove to the lands provided for them to the west of the Mississippi River, and sets forth the purpose to exchange those lands for the lands desired by the Tribe for a permanent home. To that end the Menominee Indians agreed to cede, and did cede, to the United States all lands assigned to them under the treaty of October 18, 1848, and in consideration of this cession the United States gave to the Indians, for a home to be held as Indian lands are held, the lands described in the treaty, in the 12 townships to which we have referred. The occupancy and rights of the Indians so established have never been terminated, but still continue.

In view of these statements of fact, and the purposes of the Government and the Indians in the transactions referred to, we regard the case as controlled by the decision of this court in *United States* v. *Morrison*, 240 U. S. 192, which deals with a similar grant of lands for school purposes to the State of Oregon. In that case the previous decisions of this court were reviewed, and in concluding the discussion of the effect of such school land grants this court said: "The designation of these sections was a convenient method of devoting a fixed proportion of public lands to school uses, but Congress in making its compacts with the States did not undertake to warrant that the designated section would exist in every township, or that, if existing, the State should at all events take title to the particular lands found to be therein. Congress did undertake, however, that these sections should be granted unless they had been sold or otherwise disposed of; that is, that on the survey, defining the sec-

tions, the title to the lands should pass to the State provided sale or other disposition had not previously been made, and, if it had been made, that the State should be entitled to select equivalent lands for the described purpose." (240 U. S. 201.)

The principles, thus stated, are applicable here. In our view the lands were *otherwise disposed of* by the Indian reservation of 1852, and the treaty of 1854. As we have seen, these dispositions were made before final approval of the surveys identifying sections 16.

It is insisted that this conclusion is inconsistent with the decision of this court in *Beecher* v. *Wetherby,* 95 U. S. 517. The same contention as to the effect of that decision was made in the *Morrison Case, supra,* and of it this court said (p. 205):

"In opposition to this definition of the effect of the donation for school purposes, the appellees rely upon what was said in *Beecher* v. *Wetherby,* 95 U. S. 517. That was an action of replevin to recover logs cut on a section sixteen in Wisconsin which had been granted by the Enabling Act of August 6, 1846 (c. 89, 9 Stat. 56, 58). The exterior lines of the township in which the land was situated were run in October, 1852, and the section lines in May and June, 1854; and the defendant claimed under patents from the State issued in 1865 and 1870. The land had been occupied by the Menominee Indians, but their right was only that of occupancy. 'The fee was in the United States, subject to that right, and could be transferred by them whenever they chose.' By the treaty of 1848 (9 Stat. 952) these Indians agreed to cede to the United States all their lands in Wisconsin, it being stipulated that they should be entitled to remain on the lands for two years. In view of their unwillingness to withdraw, a further act was passed (10 Stat. 1064) by which a tract was assigned to them embracing the land in controversy. Subsequently, a portion of this reservation

was assigned by another treaty to the Stockbridge and
Munsee tribes, and for the benefit of the latter Congress
passed the Act of February 6, 1871 (16 Stat. 404, c. 38)
providing for the sale of certain townships.  The plaintiff
asserted title under patents issued by the United States
in 1872 pursuant to this act.  It appeared, however, that ·
the Indian occupation of the land had ceased before the
logs were cut.  The court held that the title had vested
in the State and hence that the plaintiff had acquired no
title by his patents from the United States.  It was said
in the opinion that by the compact with the State (the
school grant) the lands were 'withdrawn from any other
disposition, and set apart from the public domain, so
that no subsequent law authorizing a sale of it could be
construed to embrace them, although they were not spe-
cially excepted'; and that after this compact 'no subse-
quent sale or other disposition  .  .  .  could defeat
the appropriation.'  But it was also stated that 'when
the logs in suit were cut, those tribes (Stockbridge and
Munsee) had removed from the land in controversy, and
other sections had been set apart for their occupation.'
That is, the lands had been surveyed in 1854; prior to
that time, there had been no other disposition of the fee
by the United States; the title had vested in the State
subject at most to the Indian occupancy, and this had
terminated.  There was abundant reason for the decision
that these lands were not embraced, and were not in-
tended to be embraced, in the provisions for sale made
by the Act of 1871.  What was said in the opinion must
be considered in the light of the facts.  (*Weyerhaeuser* v.
*Hoyt*, 219 U. S. 380, 394.)  The *Heydenfeldt Case* was not
cited and cannot be regarded as overruled.  See *New York
Indians* v. *United States*, 170 U. S. 1, 18; *Minnesota* v.
*Hitchcock*, 185 U. S. 375, 399–401."

See *Heydenfeldt* v. *Daney Gold & Silver Mining Co.*,
93 U. S. 634; *United States* v. *Thomas*, 151 U. S. 577;

*Minnesota* v. *Hitchcock,* 185 U. S. 373; *Wisconsin* v. *Hitchcock,* 201 U. S. 202.

We reach the conclusion that the lands in controversy did not pass under the school lands grant to the State of Wisconsin, and that there should be a decree for the defendant.

*It is so ordered.*

Mr. Justice McReynolds took no part in the consideration or disposition of this case.