The **FORT PECK INDIANS OF THE FORT PECK RESERVATION, MONTANA**

v.

The **UNITED STATES.**

**Appeals Docket No. 5–54.**

United States Court of Claims.
June 7, 1955.

David Cobb, Washington, D. C., for appellant. I. S. Weissbrodt, Abe W. Weissbrodt, Kenneth A. Meiklejohn, and Cobb & Weissbrodt, Washington, D. C., were on the briefs.

William D. McFarlane, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for appellee.

WHITAKER, Judge.

This case is before us on appeal from the Indian Claims Commission.

Appellant's petition before that Commission complained that the defendant, in violation of its duty under the Act of May 30, 1908, 35 Stat. 558, deferred payment of the principal and interest on the purchase price of appellant's lands sold to white settlers, and, also, in violation of the Act of May 30, 1908, reappraised the value of the lands sold and thereby reduced the amount payable for the purchase of the lands. The Indian Claims Commission held that the actions taken were for the benefit of the Indians and that the Indians were not damaged thereby, and it dismissed the petition.

We think the decision of the Indian Claims Commission was correct and it is affirmed. There are, however, two questions raised by appellant that need some discussion.

Under section 13 of the Act of May 30, 1908, supra, the defendant was directed to make allotments to members of the Indian tribe and to sell the surplus lands to white settlers, " * * * it being the intention of this Act that the United States shall act as trustee for said Indians to dispose of said lands. * * *"

We agree with the Indian Claims Commission that the defendant is not to be held to the obligations of a technical trustee and that, notwithstanding the terms of this Act, Congress retained plenary power to deal with the Indian lands in such manner as it thinks is for the benefit of the Indians. The defendant, however, has no power to deal with the Indian lands in a way that must of necessity be detrimental to the interests of the Indians. Appellant alleges that it did so.

The Act required that a commission be appointed to appraise the lands prior to sale, and for a sale of them at the ap-

praised price. Sales were made in each fiscal year as follows:

| Fiscal year ending— | Number of entries made | Number of acres entered |
|---|---|---|
| June 30, 1914 | 172 | 26,783.43 |
| June 30, 1915 | 409 | 77,440.25 |
| June 30, 1916 | 810 | 198,346.69 |
| June 30, 1917 | 1390 | 302,316.65 |

The average price for lands classified as agricultural lands was $6.32 an acre, and for those classified as grazing lands, $2.81 an acre.

After the sales were made, there were several droughts in this country, and from this and other causes there were crop failures, so that the purchasers were unable to keep up with the payments of the principal and interest. In order to prevent cancellation of the entries and the necessity for the sale of the lands covered thereby at public auction, as the Acts required, defendant deferred payment of the principal and interest from time to time. Interest at 5 percent, however, was charged on the deferred payments. We cannot say that the Indian Claims Commission was wrong in saying that this was for the benefit of the Indians.

Congress, by the Act of June 6, 1912, 37 Stat. 125, 25 U.S.C.A. § 425, premitted the Commissioner of Indian Affairs to reappraise the lands where in his judgment the original appraisal had been erroneous. This was in response to cries of distress from the entrymen. Pursuant to this Act, 264 reappraisals were made out of a total of 4,046 applications therefor. Again we agree with the Indian Claims Commission that these reappraisals were in the interest of the Indians, designed as they were to prevent cancellation of the entries and the consequent necessity of putting up the land for sale at public auction at a time when, on account of the bad crop years, the land would probably have brought a sum much less than the price at which it was originally sold.

However, appellant complains that this provision for reappraisal was made applicable to parties who had the ability to pay the price originally agreed upon, and even to those who had already fully paid the amount agreed upon and had received a patent for their lands. If the proof showed that reappraisals had been made of lands where the purchase price had been paid in full and refunds were made, we think we would be obliged to hold that this was not in the interest of the Indians and that the Government would be liable for the amounts the Indians lost thereby. However, the proof does not show this. Specifically, appellant's complaint is that the Indian Claims Commission refused its requested finding, which was to this effect:

"(1) Homesteaders on the Fort Peck Reservation were permitted to make applications for reappraisement under the procedures complained of after completion of payment for the land, provided such applications were filed not later than two years after the issuance of a patent."

The record seems to support the requested finding. Apparently applications for reappraisal of lands which had been fully paid for were made, but it does not appear that any refund was ever made on account of the reappraisal. On the contrary, it appears that such refunds from Indian funds were not made. If the record affirmatively showed that such refunds were actually made, we would probably feel required to reverse the decision below and remand the case to the Indian Claims Commission; but in the absence of a showing that refunds were actually made, we think the failure of the Indian Claims Commission to make the requested finding was not prejudicial error. It is immaterial whether or not reappraisals were made, unless refunds were made in pursuance thereof. The record indicates that no such refunds were ever made. If not, the Indians have not been damaged by the reappraisals.

The appellant also complains that reappraisals were made without taking into consideration the ability of the entryman to pay the price originally

agreed upon. Appellant's requested finding on this reads as follows:

"The reappraisements that were made by the Secretary of the Interior upon applications of individual homesteaders and transferees were made without any consideration being given by the Department of the Interior to, and without regard for, the ability or the obligation of the applicant to pay the original appraisal price."

Appellant in support of the alleged error of the Commission in not making this requested finding, points only to the fact that the applications for reappraisal requested no information as to the ability of the entrymen to pay the original purchase price, but it points to no evidence to show that this was not, in fact, given consideration in determining whether or not a reappraisal should be made.

By this we do not mean to say that a reversal would be required even if the proof did show that some reappraisals were made where the entryman was able to pay the price originally agreed upon, if it clearly appeared that a gross error had been made in the original appraisal. It may have been "good business" for the United States in such case to have adjusted the appraisal, so as not to work an unconscionable hardship upon the entrymen. It may have been "good business" looking at it from the standpoint of the Indians. We do not think that the United States in its duty as guardian was obliged to enforce an unconscionable bargain.

Appellant cites the failure of the Commission to make other findings, but we do not think they require discussion.

On the whole, the Commission's findings present the case adequately. From the findings, we think it rather clearly appears that defendant in making these reappraisals was careful to protect the interests of the Indians; out of 4,046 applications for reappraisals, only 264 applications were granted. So far as appears from the record, we think that the defendant discharged its duty as guardian for its Indian wards faithfully and well.

The decision of the Indian Claims Commission is affirmed.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.