**The Three Affiliated Tribes of the FORT BERTHOLD RESERVATION et al.**

v.

**The UNITED STATES.**
**Appeal No. 2–66.**

United States Court of ·Claims.

Feb. 16, 1968.

Charles A. Hobbs, Washington, D. C., attorney of record, for appellant. Wilkinson, Cragun & Barker, Donald C. Gormley, Francis L. Horn, and Jerry C. Straus, Washington, D. C., of counsel.

Ralph A. Barney, Washington, D. C., with whom was Acting Asst. Atty. Gen., J. Edward Williams, for appellee. Walter J. Muir, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

COLLINS, Judge.

This is an appeal from an interlocutory order, findings of fact, and opinion of the Indian Claims Commission (hereinafter the "Commission"). Appellant claims that the United States, under the Act of June 1, 1910, 36 Stat. 455, deprived it of part of its reservation lands without the payment of just compensation and, in some instances, without the payment of any compensation. Under that act, to be discussed in more detail infra, the United States (1) sold part of the reservation to homesteaders and credited the proceeds of the sales to appellant; (2) purchased certain lands from the tribe, pursuant to an act of Congress, granting such lands to the State of North Dakota for school purposes; and (3) set aside certain small reserves on the reservation for public purposes.

The appeal also presents subsidiary questions concerning (1) the proper dates for valuing the lands in question and (2) whether compensation would be due for tracts set aside for the tribe by Executive orders.

### Historical Background

The historical background of this case is fully set out by the Commission in its findings, 16 Ind.Cl.Comm. 341, 342–63. A short summary will suffice for our purposes. The Three Affiliated Tribes of the Fort Berthold Reservation (hereinafter "Fort Berthold Indians" or "appellant") constitute a corporate entity, which has succeeded to the interests of the Arikara, Gros Ventre, and Mandan Indian Tribes.

The lands disputed in this case are located in North Dakota and consist of a portion of Royce Area 713 and of Royce Area 716. Royce Area 713 was set aside for the Fort Berthold Indians pursuant to the Executive orders of April 12, 1870, I Kappler 883 (2d ed. 1904), and July 13, 1880, I Kappler 883 (2d ed. 1904); Royce Area 716 was set aside pursuant to the Executive order of June 17, 1892, I Kappler 883 (2d ed. 1904). On December 14, 1886, Government representatives entered into an agreement with the Fort Berthold Indians by which the Indians would cede part of their reservation lands for $800,000. As to the diminished portion of the reservation, the 1886 agreement provided that the members of the Fort Berthold Tribes would take individual allotments and the United States would hold the residue in trust for 25 years. At the end of the 25 years, the United States would convey the residue to the tribes in fee simple. This diminished portion of the Fort Berthold Reservation is within Royce Area 713.

However, when the 1886 agreement was finally ratified by Congress on March 3, 1891, an important amendment was made regarding the residue land. The amendment provided that, after all individual allotments had been made, the residue of the land "shall be held by the said tribes of Indians as a reservation." Ch. 543, § 23, Art. X, 26 Stat. 1032, 1035 (1891). Thus, instead of providing for eventual conveyance in fee simple, the amendment conferred upon the Fort Berthold Indians a reservation title to residue lands.

This was the status of the lands when the Act of June 1, 1910, 36 Stat. 455, was approved. This act directed the Secretary of the Interior to dispose of, for the benefit of the Fort Berthold Indians, certain surplus lands (i. e., lands not allotted or reserved) on part of the reservation in Royce Area 713. The act provided that, prior to sale, a Presidential commission would be appointed, which would have the responsibility of classifying and appraising the surplus lands in 160-acre tracts. Once the classifications and ap-praisals had been approved by the Secretary of the Interior, the lands would be opened for settlement by Presidential proclamation and disposed of, at the appraised value, under the general provisions of the homestead and townsite laws of the United States. The net proceeds of the sale were to be paid into the United States Treasury to the credit of the Fort Berthold Indians. Pursuant to the 1910 act and acts supplementary thereto, approximately 327,000 acres of surplus land were sold at the appraised prices and the proceeds placed in an interest-bearing Treasury fund to the credit of the Indians.

Another important provision of the 1910 act granted to the State of North Dakota, for school purposes, sections 16 and 36 in each township, or any lands which the state might select in lieu thereof (sometimes referred to as "lieu lands") if section 16 or section 36 or parts thereof had been allotted, reserved, or were otherwise unavailable to the state. The act specified that the United States would pay the Fort Berthold Indians the sum of $2.50 per acre for lands in sections 16 and 36 so granted, or for the lands within the reservation selected in lieu thereof. Under this provision, approximately 29,000 acres were ultimately granted to the state, for which the Indians were paid the stipulated $2.50 per acre price.

Finally, the 1910 act also authorized the Secretary of the Interior to set aside other reservation lands for designated public purposes. The appellant complains that three small parcels (identified as St. Edward Mission, Shell Creek Reservoir, and Verendrye National Monument) were taken by the Government for public purposes.

The 1910 act was passed by Congress without any treaty or agreement on the part of the Indians.

The appellant filed suit in 1951 under the Indian Claims Commission Act, seeking just compensation for its land, under the theory that its land was taken within the meaning of the Fifth Amendment of the Constitution.

*Taking of Indian Land Under the Fifth Amendment*

■ Two important subsidiary issues hinge upon the resolution of the issue of whether the Indians' land was taken from them under the Fifth Amendment. The first concerns the criteria for determining liability. If a taking under the Fifth Amendment has occurred, then appellant is, of course, entitled to "just compensation." United States v. Klamath and Moadoc Tribes, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); Yankton Sioux Tribe of Indians v. United States, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926); Miami Tribe of Oklahoma v. United States, 281 F.2d 202, 150 Ct.Cl. 725 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961). Excluding for the moment the question of interest, "just compensation" has been uniformly held to mean value at the time of taking. United States v. Klamath and Moadoc Tribes, supra. Therefore, if a taking under the Fifth Amendment has occurred, appellant need only prove that it received a sum for its lands less (no matter how much less) than the fair market value thereof to be entitled to recover the difference.

■ On the other hand, if there has been no Fifth Amendment taking, appellant can recover, pursuant to the Indian Claims Commission Act,[1] only if it shows that moneys received from the sale of the lands were so far below the then fair market value thereof as to amount to fraudulent conduct, gross negligence, or some other breach of its fiduciary obligations on the part of the Government. A mere disparity is not sufficient. Creek Nation v. United States, 97 Ct.Cl. 602, 612 (1942), cert. denied, 318 U.S. 787, 63 S.Ct. 980, 87 L.Ed. 1154 (1943); Seminole Nation v. United States, 92 Ct.Cl. 210, 216 (1940), cert. denied, 313 U.S. 563, 61 S.Ct. 841, 85 L.Ed. 1523 (1941).

■ A second difference in result is that appellant would be entitled to recover interest on any claim arising under the Fifth Amendment to the Constitution. Interest from the time of taking is automatically included in order to satisfy the demands of the Fifth Amendment. Shoshone Tribe of Indians v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); Uintah & White River Bands of Ute Indians v. United States, 152 F.Supp. 953, 139 Ct.Cl. 1 (1957).

■ However, if no taking under the Fifth Amendment has occurred, then any recovery appellant might gain under the Indian Claims Commission Act would not bear interest. Osage Nation of Indians v. United States, 119 Ct.Cl. 592, 97 F.Supp. 381, cert. denied, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951); Loyal Band or Group of Creek Indians, ex rel. Bruner v. United States, 97 F.Supp. 426, 118 Ct.Cl. 373, cert. denied, 342 U.S. 813, 72 S.Ct. 27, 96 L.Ed. 615 (1951).

In deciding whether a particular transaction involved a taking under the Fifth Amendment, we are called upon to resolve a seeming conflict between two well-established lines of cases.

---

1. 25 U.S.C. § 70a, provides, in part, as follows:

"The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. * * *"

One line emphatically asserts the plenary power of Congress to manage and control tribal Indian affairs, including their lands and funds. "Congress possesses the exclusive and plenary authority to deal with tribal Indian lands and funds as in its wisdom it deems just." Chippewa Indians of Minnesota v. United States, 88 Ct.Cl. 1 (1938), supplemental opinion, 88 Ct.Cl. 43, 47, aff'd, 307 U.S. 1, 59 S.Ct. 687, 83 L.Ed. 1067 (1939). " * * * Congress possess[es] a paramount power over the property of the Indians, by reason of its exercise of guardianship over their interests * * *. * * * Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government." Lone Wolf v. Hitchcock, 187 U.S. 553, 565, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903).

In Cherokee Nation v. Hitchcock, 187 U.S. 294, 306, 23 S.Ct. 115, 119, 47 L.Ed. 183 (1902), the Court took notice of "[t]he plenary power of control by Congress over the Indian tribes and its undoubted power to legislate * * * directly for the protection of the tribal property * * *."

Similarly, the Supreme Court recognized in Chippewa Indians of Minnesota v. United States, 301 U.S. 358, 375, 57 S.Ct. 826, 833, 81 L.Ed. 1156 (1937), that " * * * the government has power to control and manage the property and affairs of its Indian wards in good faith for their welfare * * *."

Finally, as the Court said in Tiger v. Western Inv. Co., 221 U.S. 286, 310, 31 S.Ct. 578, 584, 55 L.Ed. 738 (1911), "[T]he Congress of the United States has undertaken from the earliest history of the government to deal with the Indians as dependent people and to legislate concerning their property with a view to their protection as such."

Existing side by side with this line of cases espousing Congress' plenary power over Indian property is a line of cases holding that the Government did take Indian land in a constitutional sense and had to pay just compensation for it. See, e. g., Shoshone Tribe of Indians v. United States, supra; United States v. Klamath and Moadoc Tribes, supra; Uintah & White River Bands of Ute Indians v. United States, supra.

■ It is obvious that Congress cannot simultaneously (1) act as trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interests, and (2) exercise its sovereign power of eminent domain, taking the Indians' property within the meaning of the Fifth Amendment to the Constitution. In any given situation in which Congress has acted with regard to Indian people, it must have acted either in one capacity or the other. Congress can own two hats, but it cannot wear them both at the same time.

Some guideline must be established so that a court can identify in which capacity Congress is acting. The following guideline would best give recognition to the basic distinction between the two types of congressional action: Where Congress makes a good faith effort to give the Indians the full value of the land and thus merely transmutes the property from land to money, there is no taking. This is a mere substitution of assets or change of form and is a traditional function of a trustee. While not every word of every opinion can be harmonized with this guideline, it is basic to the holdings of at least the great majority of cases in this area.

Looking first at cases which upheld the plenary power of Congress over tribal property, the case of Lone Wolf v. Hitchcock, supra, bears out the validity of such a guideline. This case involved a suit by Indians to enjoin the sale of "surplus" lands to the United States for $2,000,000, pursuant to the Act of June 6, 1900. The act incorporated an 1891 agreement with the Indians, which the Indians claimed was invalid because their proper assent had never been given.

The Supreme Court, upholding the Act of June 6, 1900, on the ground that the

assent of the tribe was not necessary, gave the following rationale:

    * * * Indeed, the controversy which this case presents is concluded by the decision in Cherokee Nation v. Hitchcock, 187 U.S. 294 [23 S.Ct. 115, 47 L.Ed. 183], decided at this term, where it was held that full administrative power was possessed by Congress over Indian tribal property. In effect, the action of Congress now complained of was but an exercise of such power, *a mere change in the form of investment of Indian tribal property*, the property of those who, as we have held, were in substantial effect the wards of the government. * * * [Emphasis supplied. 187 U.S. at 568, 23 S.Ct. at 222.]

In Chippewa Indians of Minnesota, 88 Ct.Cl. 1 (1938), aff'd, 307 U.S. 1, 59 S.Ct. 687, 83 L.Ed. 1067 (1939), the Indians tried to recover amounts which Congress had disbursed from certain tribal funds accruing from the sale of surplus land. The expenditures were all for the benefit of the Indians, including, for example, educational and drainage facilities. The basis of the Indians' complaint was that an earlier act of Congress had provided that the funds were to be conserved for the benefit of the Indians, eventually to be distributed to the Indians. This court upheld the Government, holding that it had merely exercised its plenary power and authority over tribal property. We see no difference between the exchange in that case of funds belonging to the Indians for educational and drainage facilities and the exchange in this case of land for money. Both involve a mere substitution of assets under Congress' plenary power over tribal property.

Another case indicating that the sale of tribal land for the benefit of the Indians falls under the plenary powers of Congress is Fort Peck Indians of Peck Reservation, Mont. v. United States, 132

F.Supp. 222, 132 Ct.Cl. 373 (1955). The defendant was directed by statute to sell surplus land to white settlers " '* * * it being the intention of this Act [of May 30, 1908, § 13] that the United States shall act as trustee for said Indians to dispose of said lands. * * *' " 132 F.Supp. at 223, 132 Ct.Cl. at 374.

The Indians were seeking judgment against the United States because it had permitted a delay in the payments of principal and interest on the purchase prices and had reappraised some of the lands, which resulted in a reduction in the amount payable for the purchase of the lands.

This court agreed with the Indian Claims Commission that, notwithstanding the terms of the act, "Congress retained plenary power to deal with the Indian lands in such manner as it thinks is for the benefit of the Indians," 132 F.Supp. at 223, 132 Ct.Cl. at 374–375, and that the defendant had faithfully discharged its duty as guardian for its Indian wards.

Looking at some of the cases cited by plaintiff which held that a Fifth Amendment taking had occurred, there is no evidence that Congress, in any of those instances, was attempting to give the Indians the full value of the land. In three quite similar cases,[2] the Indian lands were erroneously surveyed by the Government and, as a consequence, were subsequently disposed of by acts of Congress either by sale and patent to settlers or by allotment to other tribes. In each case, the Government, in dereliction of its fiduciary obligations, made no attempt to give the Indians any compensation. Similarly, in Yankton Sioux Tribe of Indians v. United States, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926), after the United States had taken possession of Indian land, the Secretary of the Interior negotiated an agreement with the Indians to pay $100,000 for the land. However, Congress never ratified the agreement,

---

2. United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935) ; Sioux Tribe of Indians of Lower Brule Reservation S. D. v. United States, 315 F.2d 378, 161 Ct.Cl. 413, cert. denied, 375 U.S. 825, 84 S.Ct. 66, 11 L.Ed.2d 57 (1963) ; Seminole Nation v. United States, 102 Ct.Cl. 565 (1944), cert. denied, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945).

so the Indians were paid nothing. Again, there was no attempt by Congress to transmute land to money for the Indians.

In several cases, the Supreme Court acknowledged the plenary power of Congress over Indian property but, nevertheless, went on to find that a taking had occurred. For example, in United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935), where the United States sold Creek lands to settlers and to other Indians because of an erroneous survey, retaining the proceeds of the dispositions for itself, the Court gave the following rationale in holding that a taking had occurred:

> * * * The tribe was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government. But this power to control and manage was not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it was subject to limitations inhering in such a guardianship and to pertinent constitutional restrictions. It did not enable the United States to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them; for that "would not be an exercise of guardianship, but an act of confiscation." * * * [295 U.S. at 109–110, 55 S.Ct. at 684.]

In holding that confiscation involved disposing of Indian land without assuming an obligation to render just compensation, the Supreme Court employed a standard similar to the one adopted by this court in the instant case. Since just compensation is understood to mean fair market or full value, the Court in *Creek Nation* was distinguishing between guardianship and confiscation by pointing out that control over Indian property in a guardian-type capacity includes the obligation to pay the full value for the property. Since nothing was paid, the act was one of confiscation.

Part of the above-quoted language in the *Creek Nation* case was cited by the Supreme Court in Shoshone Tribe of Indians v. United States, supra, 299 U.S. at 497, 57 S.Ct. 244. The Court held that there had been an appropriation of Shoshone property within the meaning of the Fifth Amendment when the Government, by military force, permanently moved a band of Arapahoes onto the Shoshone Reservation. Again, the Government had made no effort to transmute the Indians' lost property rights into money.

In Chippewa Indians of Minnesota v. United States, 301 U.S. 358, 57 S.Ct. 826, 81 L.Ed. 1156 (1937), the question was whether Congress could authorize several diverse tribes in a state to cede the land of one of the tribes to the United States, to be held for the benefit of all the tribes. The Court, in the following language, held that Congress could not:

> * * * Our decisions, while recognizing that the government has power to control and manage the property and affairs of its Indian wards in good faith for their welfare, show that this power is subject to constitutional limitations and does not enable the government to give the lands of one tribe or band to another, or to deal with them as its own. * * * [301 U.S. at 375–376, 57 S.Ct. at 833.]

In short, it is concluded that it is the good faith effort on the part of Congress to give the Indians the full value of their land that identifies the exercise by Congress of its plenary authority to manage the property of its Indian wards for their benefit. Without that effort, Congress would be exercising its power of eminent domain by giving or selling Indian land to others, by dealing with it as its own, or by any other act constituting a taking.

*Land Sold to Homesteaders*

Turning now to the instant case, the Commission's determination on the criteria for liability (16 Ind.Cl.Comm. at 391) implies that the Commission was of the opinion that the lands sold to the

homesteaders were not taken from appellant under the Fifth Amendment. We agree. The facts of this case establish that Congress was not taking Indian land and giving it to the settlers, but was making a good faith effort to transmute Indian property from land to money by giving the Indians the full money value of the land.

The act of 1910 itself stipulated that it was "the intention of this Act that the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof * * *." Ch. 264, § 14, 36 Stat. 458, 459. To insure impartiality insofar as possible, the act also provided for the appointment of a three-man commission, one of whom was to be a member of the tribe, to classify and appraise the land. There is no evidence or suggestion that the commission did not act in perfect good faith and do its best to find reasonable prices.

The fact that this commission came up with three separate classifications (agricultural land of the first class, agricultural land of the second class, and grazing land), each with a different price range, reinforces the impression that the commission acted rather carefully.

Therefore, we hold that defendant is not liable to appellant for a taking of tribal lands within the meaning of the Fifth Amendment. As stated by the Indian Claims Commission, appellant can recover only if it can show that moneys received from the sale of lands were so far below the fair market value as to amount to fraudulent conduct or gross negligence.

### The School Lands

█ The opinion of the Indian Claims Commission does not expressly accept or reject appellant's contention that a Fifth Amendment taking occurred in respect to the school lands. From this we assume the Commission rejected appellant's contention, for a finding of a Fifth Amendment taking would at least deserve mention.

At any rate, our own conclusion is that a taking did occur for which appellant is entitled to just compensation, including interest, subject, of course, to an offset for the amount already received.

As described above, the 1910 act directly granted to the State of North Dakota, for school purposes, sections 16 and 36 in each township or "lieu lands" outside these sections if those lands within sections 16 and 36 had been allotted.

The act further specified:

* * * That the United States shall pay to the said Indians for the lands in said sections sixteen and thirty-six, so granted, or the lands within said reservation selected in lieu thereof, the sum of two dollars and fifty cents per acre. [Ch. 264, § 8, 36 Stat. 457.]

Pursuant to the above provision of the 1910 act, the Government immediately placed $100,000 to the credit of the Indians, said moneys being carried on the books of the Treasury under the heading, "Fort Berthold Reservation 3% Fund." At $2.50 per acre, this would cover the purchase of up to 40,000 acres.

There is no indication of how Congress arrived at the $2.50 figure. There was no attempt to classify the school lands, so the flat $2.50 per acre applied whether the school lands consisted of first or second class agricultural land or grazing land. Since sections 16 and 36 of each township were scattered geographically throughout the entire reservation, it is likely that they contained at least some agricultural land, which was appraised by the commission examining the homestead lands at prices up to $6 an acre. Also, the flat $2.50 per acre rate applied whether the state selected sections 16 and 36 or "lieu lands." It would seem the merest coincidence if the "lieu lands," which could be in any other unallotted sections of the township chosen by the state, were identical in nature and value to sections 16 and 36.

The conclusion is unavoidable that, with regard to the land given to the state, Congress simply said the land was worth $2.50 per acre, but made no effort to de-

termine whether that was what the land was truly worth. In other words, $2.50 appears to be just the figure Congress wanted to pay. Congress apparently didn't even attempt to ascertain what type of land comprised the sections given to the state, let alone what it was worth. The simple designation of $2.50 per acre as the price Congress would pay the Indians for the land is to be contrasted with the careful effort Congress made with regard to the homestead lands to commute the Indians' land into money by giving them the full value thereof. Congress was not acting as trustee for the Indians with regard to the school lands, but was exercising its power of eminent domain in order to grant this land to the State of North Dakota.

This holding necessarily rejects defendant's contention that there can not be a constitutional taking of lands as long as the United States had paid the Indians for such lands, regardless of the amount of the payment.

It is true that, in many of the cases where a taking was held to have occurred, defendant paid nothing for the land. However, a payment of nothing is merely the clearest and most extreme example of the failure of Congress to pay full value. It is the attempt to pay the full present market value of the land which gives the transaction the character of a trustee's conversion of one asset into another. There is no basis in reason to distinguish between no compensation, minimal compensation, or compensation arbitrarily determined. If Congress pays the Indians a nominal amount, or (as it did here) an amount arbitrarily arrived at with no effort to ascertain if it corresponds to the true market value of the land, then it cannot be said that Congress is merely authorizing the conversion of one form of tribal property to another. A necessary corollary to a mere change in the form of property is that both forms have the same, or at least nearly the same, value.

Moreover, the Government has frequently been held liable for just compensation under the Fifth Amendment, despite payment on its part to the Indians for the land taken. See United States v. Klamath and Moadoc Tribes, supra; Miami Tribe of Oklahoma v. United States, 281 F.2d 202, 150 Ct.Cl. 725 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961); Uintah & White River Bands of Ute Indians v. United States, 152 F.Supp. 953, 139 Ct.Cl. 1 (1957).

One apparently contrary case is not in point. In Pawnee Indian Tribe of Oklahoma v. United States, 301 F.2d 667, 157 Ct.Cl. 134, cert. denied, 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 498 (1962), land excluded from the tribal reservation was paid for by a subsequent appropriation of Congress. The Indian Claims Commission granted recovery to the Indians on the basis that the consideration paid was unconscionable, but denied recovery of interest. 8 Ind.Cl.Comm. 648, 756–57 (1960). This court upheld the Commission's denial of interest with the following comment:

The United States thus acquired this acreage by purchase and not by condemnation and, hence, plaintiff is not entitled to interest. [301 F.2d at 670, 157 Ct.Cl. at 141.]

In our opinion, the court was not implying by the quoted statement that any payment automatically prevented the United States from being liable for a taking under the Fifth Amendment. Rather, the court was relying upon the particular facts of the case to reach the conclusion that there was no taking because the land was acquired by "purchase" in the conventional sense—i. e., acquired for a consideration pursuant to an agreement by both parties. The court apparently based its conclusion upon the explicit holding by the Commission that there was "an implied agreement between the United States and the Pawnees that the * * * [land] should be taken by the United States with payment of compensation to the Pawnees for the area taken." 8 Ind.Cl.Comm. 648, 756 (1960). Of course, this conclusion lends no support to defendant here because there is no suggestion of an implied agreement

in the instant case relating to the school lands.

### Compensability of Executive Order Lands

The Commission held that the tribe lacked compensable title to a tract of land identified as Royce Area 716, and therefore that the tribe was not entitled to additional compensation for the parcels within that tract which had been patented to homesteaders.

That tract was added to the Fort Berthold Reservation by the Executive order of June 17, 1892 (I Kappler 883). Thus, these lands were not covered by the Act of March 3, 1891, 26 Stat. 1032, described in the beginning of this opinion, which provided that certain residue land, including lands added to the reservation by the Executive orders of 1870 and 1880, would be held by the tribes as a reservation. In the view of the Commission, Congress, by confirming reservation title upon the tribes in the Act of March 3, 1891, expressly recognized appellant's interest in the lands added by the Executive orders of 1870 and 1880. Therefore, appellant did have a compensable interest in those lands,[3] but did not have a compensable title to the land added by the Executive order of June 17, 1892, since that land was added after the act of 1891, and Congress took no subsequent action to recognize the title of appellant to this land.[4]

This amounts to a holding by the Commission that Executive order title is not compensable, and with this holding the court must disagree.

■ In doing so, we pretermit any consideration of compensability under general Indian law, for we find it abundantly clear that Executive order title is compensable under the Indian Claims Commission Act. We need only look at the plain language of the statute which expressly provides that the Commission shall hear and determine " * * * claims in law or equity arising under the Constitution, laws, treaties of the United States, and *Executive orders of the President* * * *." [Emphasis supplied.] Ch. 959, § 2, 60 Stat. 1050, 25 U.S.C. § 70a. Similarly, section 24 of the act, now covered by 28 U.S.C. § 1505, gives this court jurisdiction of any claim accruing after 1946 arising under the "Constitution, laws or treaties of the United States, or *Executive orders of the President* * * *." [Emphasis supplied.] In the context of the Indian Claims Commission Act, "Executive orders of the President" must be a reference to those interests in lands bestowed upon Indians by Presidential Executive orders. The only conclusion that can be drawn from the inclusion of such interests in the act is that Congress must have intended to make them compensable. Otherwise Congress would be doing a meaningless act—granting the Indian Claims Commission and the Court of Claims jurisdiction to hear a class of cases for which no recovery can be had.

We have been referred to no legislative history which casts any doubts upon this common sense interpretation of the plain words of the statute.

Furthermore, while this court has never consciously addressed itself to the question of compensability of Executive order title under the Indian Claims Commission Act, we feel that the reasoning of this court in Otoe & Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 131 Ct.Cl. 593, cert. denied, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 55 (1955), is equally applicable here. It was held that the Indian Claims Commission Act makes aboriginal title compensable despite the fact it was not compensable under general Indian law.[5] The court said (131 F.Supp. at 275, 276, 131 Ct.Cl. at 607, 609):

* * * Congress wished to settle all meritorious claims of long standing of Indian tribes and bands whether those claims were of a legal or equitable nature which would have been

---

3. 16 Ind.Cl.Comm. at 375.

4. Finding 10, 16 Ind.Cl.Comm. at 348.

5. See Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955).

cognizable by a court of the United States had the United States been subject to suit and the Indians able to sue, or whether those claims were of a purely moral nature *not* cognizable in courts of the United States under any existing rules of law or equity. * * *

* * * * * *

The court should give the statute the plain meaning indicated by its language unless that *meaning is clearly* at variance with the legislative purpose as manifested by the whole act and confirmed by the legislative history * * *. * * *

We note that aboriginal title was held compensable under the Indian Claims Commission Act even though it is not mentioned in that act. A fortiori, Executive order title should be compensable under the act, since the act does explicitly recognize it.

### The Small Reserves °

Appellant is also seeking compensation for three small tracts of land which were set aside for public purposes.

(a) St. Edward Mission.

■ This 160-acre tract upon which is located the St. Edward Mission was added to the tribes' lands by the 1870 Executive order. The tract was set aside for use by the Mission in 1889, by order of the Interior Department. On September 16, 1916, the United States issued a patent in fee simple for the land to the Bureau of Catholic Indian Missions. Appellant claimed the issuance of a patent constituted a constitutional taking of its land.

The Commission held that the land was taken back from the Indians in 1889, not 1916, and therefore, since the land was lost prior to the Act of March 3, 1891, confirming reservation title upon the tribes, the tribes had Executive order title only and, thus, lacked compensable title.

In our opinion, the Commission erred in failing to realize that, by the 1891 act, Congress recognized appellant's title to the Mission tract. The act decreed

" 'That the residue of lands within said diminished reservation, after all allotments have been made as provided in article three of this agreement, shall be held by the said tribes of Indians as a reservation.' " Ch. 543, § 23, Art. X, 26 Stat. 1032, 1035. It is undisputed that the land occupied by the St. Edward Mission was located in the area of the "diminished reservation," and that it was not allotted to any members of the tribes. Since nothing in the act exempted the Mission tract from congressional recognition of appellant's title, the unambiguous words of the act compel the conclusion that this tract was "held by said tribes of Indians as a reservation" when it was patented to the Mission in 1916. The act of patenting appellant's land to the Mission, without any compensation to the Indians, constituted a taking under the Fifth Amendment, for which appellant is entitled to just compensation.

(b) Shell Creek Reservoir.

This 490.81-acre tract was set aside for a reservoir site by the Secretary of the Interior on October 21, 1911, under the authority of the 1910 act, without payment of compensation. The Commission found, in effect, that there was a taking of this tract within the meaning of the Fifth Amendment and that appellant is entitled to just compensation therefor. The defendant has not taken issue with this holding, and we uphold it.

(c) Verendrye National Monument.

■ This 253.04-acre parcel was set aside by a Presidential proclamation issued on June 29, 1917. Under the Act of February 14, 1920, ch. 75, § 16, 41 Stat. 424, the Indians were paid $5 per acre for this land. The Commission found that the United States purchased these lands for $5 per acre, and for purposes of determining whether the consideration was unconscionable, the date of valuation would be June 29, 1917, the date of the Presidential proclamation reserving the monument grounds. 16 Ind.Cl.Comm. at 365–366, 389.

We do not agree that the United States purchased this tract from the tribes. There is no evidence that the tribes

agreed to the setting aside or to the amount appropriated by Congress in the 1920 act. The United States simply took possession and ownership of the land for itself in 1917, without the payment of compensation—the clearest case of a Fifth Amendment taking. Uintah & White River Bands of Ute Indians v. United States, supra. A unilateral appropriation of money several years later does not affect the character of the original taking. See United States v. Klamath and Moadoc Tribes, supra; Uintah & White River Bands of Ute Indians v. United States, supra; and Miami Tribe of Oklahoma v. United States, supra. Accordingly, appellant is entitled to recover the difference between what the land was worth at the time it was taken and the amount that it was paid.

### Valuation Dates

(a) Land sold to homesteaders.

The Indian Claims Commission concluded that the valuation dates for the lands sold to homesteaders should be the date when the particular homesteader actually entered and settled on the lands of his choice. Appellant takes the position that the date on which the Indians were divested of title is the date on which the land should be valued, and that is the date of patent or final certificate, citing Creek Nation v. United States, 302 U.S. 620, 58 S.Ct. 384, 82 L.Ed. 482 (1938), and several other cases.

■ We agree with the Commission. The cases cited by appellant were cases involving a taking under the Fifth Amendment, and they stand for the proposition that the proper method of computing value for property taken is to base it on value at the time of the taking. The taking is deemed to have occurred when title in each individual homesteader became final—i. e., when the final patent was issued. See Creek Nation v. United States, supra; Yakima Tribe of Indians v. United States, 158 Ct.Cl. 672 (1962).

However, these cases are not applicable because, in the instant case, no taking occurred. Therefore, we need not be bound by technical questions of passage of title, but instead can look to other relevant considerations. As a practical matter, appellant's permanent possession and use of the surplus, unallotted, and unreserved reservation lands terminated when the homesteader actually entered and settled upon the tract chosen by him. Although legal title remained in the Government until the patent issued, the entryman "was the lawful possessor, clothed with an inceptive title * * *." United States v. Buchanan, 232 U.S. 72, 77, 34 S.Ct. 237, 239, 58 L.Ed. 511 (1914). "From the making of his entry the homesteader has the right of possession as against trespassers and all others except the United States; he has also an inchoate title * * *. * * * [W]hen he has fulfilled the conditions imposed upon him and receives a patent vesting in him the complete legal title, this title relates back to the date of the initiatory act * * * *." Knapp v. Alexander-Edgar Lumber Co., 237 U.S. 162, 166–167, 35 S.Ct. 515, 516, 59 L.Ed. 894 (1915).

Moreover, the value of the lands at the date the patents issued is completely irrelevant in terms of the main issue here. The United States sold these lands for the benefit of the Indians in its capacity as trustee over tribal property. As stated above in this opinion, appellant can recover only if it shows that moneys received from the sale of the lands were so far below the fair market value as to amount to fraudulent conduct, gross negligence, or some other breach of defendant's fiduciary obligations. The question is then against what fair market value do you measure the money received. It is completely illogical to measure the money received against the value of the land at the time the patent was issued—which could conceivably be as long as 6 years from the time of purchase. The Government had no way of knowing what the value would be years after the sale; its obligation was to get a fair price at the time it sold the land. Thus, the money received must be measured against the value of the land on a date that has some relevance to the sale. We uphold the

Commission's choice of the date of entry as the proper valuation date, since that is when the United States became committed to the sale and that is also the date marking the appellant's loss of permanent use and possession of the land.

(b) The school lands.

The act of 1910 provided that "sections sixteen and thirty-six of each township * * * are hereby granted to the State of North Dakota for school purposes * * *," and that if either of said sections were unavailable to the state, it could select other unreserved land in lieu thereof. Ch. 264, § 8, 36 Stat. 457.

The Commission found that the proper valuation date for all the school lands, both the "place lands" (section 16 and 36 in each township) and the "lieu lands," shall be the effective date of the act (June 1, 1910). According to the Commission, when the Government, pursuant to the 1910 act, placed $100,000 in a fund for appellant, it purchased from appellant lands sufficient to cover the ultimate selection of up to 40,000 acres of school lands by the State of North Dakota. The Commission also reasoned that when defendant deposited $100,000 in the fund for appellant, the Indians no longer had any interest in the matter of when, where, and how the State of North Dakota would make its school selections so long as no more than 40,000 acres of surplus unallotted land were selected.

We cannot agree with the Commission. The school lands were not "purchased," but were taken under the Fifth Amendment, entitling the Indians to just compensation—i. e., value at the time of the taking. United States v. Klamath and Moadoc Tribes, supra. The payment of $100,000 in 1910 did not settle title, but merely established an offset against the just compensation to which the tribe would ultimately be entitled. The Indians are suing for the taking of their ownership, and this did not occur until title passed to the state.

We agree with the Commission's choice of the 1910 act as the valuation date only for those "place lands" in sections 16 and 36 which had been surveyed by the date

of the act. Since the act contained words of present grant, as to sections 16 and 36, the passage of the act itself conveyed to the state title to those lands in sections 16 and 36 which had already been surveyed.

As to the section 16 and section 36 lands which had not then been surveyed, since these could not be identified, the act could pass no title to them. Title to those lands was not acquired by the state until the surveying had been completed. United States v. State of Wyoming, 331 U.S. 440, 67 S.Ct. 1319, 91 L.Ed. 1590 (1947), and State of Wisconsin v. Lane, 245 U.S. 427, 38 S.Ct. 135, 62 L.Ed. 377 (1918). Since no title passed and since there is no evidence to suggest that the Indians were deprived of possession or enjoyment prior to the surveying, we hold that the completion of the surveying marks the date of the taking for these lands and therefore is the proper valuation date.

The "lieu lands" present an even stronger case. These lands had not been selected by the state at the time of the passage of the act. The law is well settled that, where a state is given an option to select "lieu lands," title does not pass to the state until the lands are actually selected by the state. McNee v. Donahue, 142 U.S. 587, 601, 12 S.Ct. 211, 35 L.Ed. 1122 (1892), and Hedrick v. Hughes, 82 U.S. (15 Wall.) 123, 129, 21 L.Ed. 52 (1872). Thus, no "lieu lands" were taken from appellant until actually selected by the state.

Also, it is unrealistic to say that, with the passage of the act and the deposit of $100,000 in 1910, the Indians no longer had any interest in when or where the state would make its school selections. Different sections would have different values, so the Indians had a very real interest in whether the state selected, for example, agricultural land worth $6 an acre or grazing land worth $1.50 an acre. It would be quite unfair to limit appellant to the 1910 value of land when the state made many selections several years thereafter, with the freedom to

choose the most valuable land available and the knowledge of the latest values.

■ Therefore, we hold that, although the 1910 act was the underlying authority for the grant of school lands to the state, the grant could not take place, and appellant's property rights were not extinguished, until the "place lands" were surveyed and the "lieu lands" were selected from surveyed lands. It was held in the cases of Creek Nation v. United States, 302 U.S. 620, 58 S.Ct. 384, 82 L.Ed. 482 (1938), and Seminole Nation v. United States, 102 Ct.Cl. 565 (1944), cert. denied, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945), that the date of taking is not the date of the statute authorizing disposition, but the date on which the lands are actually disposed of by the Federal Government. In those cases, the actual disposition was accomplished by conveying title through issuance of patents; in the instant case, disposition of the school lands occurred by passage of title to the three different categories of school lands in the manner outlined above.

Since the Commission erroneously ruled that the 1910 act marked the proper valuation date for all the school lands, it was not faced with the question of selecting an average date of valuation for school lands taken on varying dates. We remit this question to the Commission for its determination, consistent with this opinion.

(c) The small parcels.

■ As was stated supra, the act of 1891 gave appellant recognized title to the St. Edward Mission land, which title appellant lost when a patent was issued to the Mission on September 16, 1916. The issuance of the patent constituted a taking, and thus the proper valuation date is the September 16, 1916, taking date.

■ The parties agree with the Indian Claims Commission that the date of valuation for the Shell Creek Reservoir should be October 21, 1911, the date the tract was set aside by the Secretary of the Interior. The parties also agree with the Commission that the proper valuation date for the Verendrye National Monument lands should be June 29, 1917, the date of the Presidential proclamation setting aside the monument grounds. Since the court also finds itself in agreement, we uphold the Commission on these issues.

*Selection of an Average Valuation Date*

■ Appellant contends that the Commission should have selected one average date for the purpose of valuing all the lands taken under authority of the act—i. e., the school lands, the lands sold to homesteaders, and the small parcels. Appellant cites Creek Nation v. United States, supra, 302 U.S. at 622, 58 S.Ct. 384, as authority for the proposition that land taken from an Indian tribe by a number of small sales should be valued on an average date. Instead, the Commission ruled that each of the small parcels was to be valued as of the date it was set aside the school lands were to be valued as of the effective date of the 1910 act, and the homestead lands were to be valued as of four different dates—the average date of entry covering all the recorded sales in each of the four separate offerings to settlers.[6]

6. Under the provisions of the 1910 act, about 205,000 acres of surplus, unallotted, and unreserved reservation lands were duly appraised and offered for homestead sale and entry, beginning on May 1, 1912. Under the provisions of the Act of August 3, 1914, 38 Stat. 681, about 111,000 acres of the land that had been reserved from sale under the 1910 act because they were coal bearing were reclassified, appraised, and offered for sale to homesteaders and became subject to entry on May 1, 1916.

On September 6, 1916, approximately 7,000 acres of land, which had been previously omitted from classification and appraisal, were opened for settlement and made available for entry beginning November 13, 1916. By the Act of March 3, 1917, 39 Stat. 1131, about 9,000 acres of land lying within sections 16 and 36 and previously withheld pending determination of school land claims of the State of North Dakota were, upon reappraisal, offered for homestead sale and entry.

Although we have already rejected the date of the 1910 act as the proper valuation date for all the school lands, we do uphold the refusal of the Commission to select one average date for all the lands, since this is a decision within its discretion. Appellant is not contending that the Commission had the authority to select an average date, but that the Commission was legally bound to do so. However, in the *Creek Nation* case, cited by appellant, the Supreme Court did not lay down a mandatory rule requiring the adoption of an average date, but held only that an average date "may be adopted" in order to avoid burdensome detailed computations. 302 U.S. at 622, 58 S.Ct. 384. Also, in the *Creek Nation* case, there was more of a continuous sales process than is true in the instant case. Here the act of 1910 divided the lands into different categories and made provision for the sale of some and the retention of others accordingly. Subsequent legislation authorized the disposition of lands which had previously been reserved.

In essence, by requiring several valuation dates instead of one, the Commission was requiring a higher degree of accuracy than appellant's one average date would have given. The refusal to depart from accuracy for the sake of convenience would seem peculiarly a matter of discretion, depending on the particular facts of the case, and we cannot say that the Commission abused its discretion here.

*Summary*

In summary, the court holds:

(1) The land the Government sold and patented to homesteaders, including the Executive order land in Royce Area 716, was not taken under the Fifth Amendment of the Constitution, but was disposed of pursuant to the authority which Congress exercises over Indian tribal property. Appellant is entitled to recover only if it can show that the price at which the Government sold those lands was so far below the fair market value as to constitute gross negligence, fraudulent conduct, or an abuse of the Government's fiduciary relationship.

(2) The lands taken by the Government and given to the State of North Dakota for school lands and the lands set aside for the St. Edward Mission, for the Shell Creek Reservoir, and for the Verendrye National Monument did constitute a taking under the Fifth Amendment, and appellant is entitled to just compensation, including interest, less any compensation heretofore paid by defendant.

(3) The valuation dates for the several takings are as follows:

(a) The average date of entry for the lands sold to homesteaders shall be computed separately for each of the four different entries;

(b) For the school lands, the court finds that the proper valuation date is the day on which title passed—

(i) June 1, 1910, the date of the 1910 act, for those "place lands" (sections 16 and 36) previously surveyed;

(ii) The date of the completion of the surveying for the remainder of the "place lands";

(iii) The date the state made its selection of previously surveyed "lieu land";

(c) For the taking of St. Edward Mission, September 16, 1916;

(d) For the taking of the Shell Creek Reservoir, October 21, 1911; and

(e) For the taking of the Verendrye National Monument, June 29, 1917.

The determination of the Indian Claims Commission is affirmed in part, reversed or vacated in part, and remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed or vacated in part, and remanded.